219 P.3d 675 (2009)
KITSAP COUNTY DEPUTY SHERIFF'S GUILD, Petitioner, and
Deputy Brian LaFrance and Jane Doe LaFrance, and the marital community composed thereof, Plaintiffs,
v.
KITSAP COUNTY and Kitsap County Sheriff, Respondents.
No. 80720-5.
Supreme Court of Washington, En Banc.
Argued January 22, 2009.
Decided October 29, 2009.
*676 James Michael Cline, Christina T. Sherman, Cline & Associates, Seattle, WA, for Petitioner/Appellant.
Jacquelyn Moore Aufderheide, Kitsap Co. Pros. Office, Port Orchard, WA, for Appellees/Respondents.
George E. Merker III, Merker Law Offices, Bainbridge Island, WA, for Amici Curiae Okanogan County Deputy Sheriff's Guild and Yakima Police Patrolman's Association.
William B. Aitchison, Attorney at Law, Portland, OR, Christopher K. Vick, Attorney at Law, Seattle, WA, for Amicus Curiae Washington Council of Police and Sheriffs (WACOPS).
Kara Anne Larsen, Office of Atty. Gen., Olympia, WA, for Amicus Curiae State of Washington.
Pamela Beth Loginsky, Washington Assoc. of Pros. Atty., Olympia, WA, for Amicus Curiae Washington Association of Prosecuting Attorneys.
Daniel Brian Heid, City of Auburn, Auburn, WA, for Amicus Curiae Washington State Association of Municipal Attorneys.
OWENS, J.
¶ 1 Kitsap County (County) fired Deputy Brian LaFrance for 29 documented incidents of misconduct, including untruthfulness. An arbitrator heard the case pursuant to a collective bargaining agreement and determined that the charges against LaFrance were accurate but that termination was not the appropriate penalty. The Court of Appeals overturned the arbitrator's decision as contrary to public policy. The Kitsap County Deputy Sheriff's Guild (Guild) appeals that decision, contending that the Court of Appeals failed to describe the specific public policy violated by the arbitrator's decision. Further, the Guild argues that the arbitrator's decision qualifies LaFrance for back pay.
¶ 2 In order to vacate an arbitrator's decision as contrary to public policy, the public policy must be explicit, well defined, and dominant. We reverse the Court of Appeals because the arbitrator's decision does not violate an explicit, well defined, and dominant public policy. We affirm the trial court's holding that LaFrance is not entitled to back pay because the arbitrator's decision explicitly denied any such pay.

FACTS
¶ 3 LaFrance worked as a deputy for 14 years, during which he was disciplined several times. Beginning in May 2000, LaFrance began to behave unusually. He had been assigned to a child pornography task force, and he became "obsessive" and "fixated" on this work and on "`protecting the children.'" Clerk's Papers (CP) at 46 (Arbitrator's Decision & Award[1]). Despite repeated warnings and reprimands, LaFrance continued to work outside his regular shift without permission and maintain an unacceptable number of open cases. His obsessive behavior increased throughout 2000, and it became "obvious in hindsight that Deputy LaFrance was disabled and incapable of performing his job." CP at 48. In fall 2000, LaFrance was reassigned to the patrol division and instructed to return all equipment and uncompleted cases. By this point, LaFrance had developed *677 "paranoia" and "delusions of persecution." CP at 49. LaFrance failed to return the case files and equipment, and in January 2001, he was suspended for two days after an internal investigation. In addition, in January 2001, an equipment audit discovered that LaFrance had failed to secure a pistol issued to him. LaFrance had said that he had turned in the weapon, but it had instead been found in an unlocked desk drawer. In February 2001, following the discovery of additional files in LaFrance's possession after he denied having any other files multiple times, LaFrance was placed on administrative leave pending further investigation.
¶ 4 During the County's investigation, LaFrance appeared "erratic and confused." CP at 58. The County ultimately terminated LaFrance based on the 29 documented incidents summarized above. The Guild filed a grievance and requested arbitration. The collective bargaining agreement between the Guild and the County stated that the arbitrator's decision would be final and binding on the parties. The arbitrator addressed the issue, "Did the County discipline Brian LaFrance without just cause, and if so, what is the appropriate remedy?" CP at 39. The arbitrator held that the County met six of the seven elements of just cause,[2] including showing that LaFrance had been untruthful, but that the County had failed to show that "the degree of discipline administered was reasonably related to the seriousness of the proven offenses." CP at 77. Specifically, the arbitrator found that LaFrance's mental disability was apparent from his behavior and that the County should have recognized this and referred him for counseling and fitness-for-duty exams. The arbitrator reduced LaFrance's penalty to three separate final written warnings and ordered the following remedy:
Since [LaFrance] was not fit for duty at the time of his discharge, he should be made whole by retroactively placing him in the position that he would otherwise have been in. Specifically, Deputy LaFrance should be allowed to access any benefits that an officer in good standing could have accessed as of his date of discharge including sick leave, disability benefits, or any other benefit provided to disabled employees covered by this Collective Bargaining Agreement. Since Deputy LaFrance was (and possibly still is) incapacitated he is not entitled to back pay per se, but may keep any Unemployment Insurance benefits for which he is monetarily eligible.
[LaFrance] should also be allowed to return to full duty upon passing independent psychological and physical fitness-for-duty exams as normally utilized by the Employer. The retroactivity of the return of [LaFrance] to regular status is not an issue in this case due to the lengthy continuance requested by the Guild and necessitated by Deputy LaFrance's heart attack.[3]
CP at 83.
¶ 5 LaFrance felt that the County was not implementing the arbitration award and filed for breach of contract in superior court. The County filed for summary judgment on the breach of contract claim and additionally filed a petition for writ of certiorari requesting review and vacation of the award. The superior court granted summary judgment to the County on the breach of contract claim but refused to vacate the arbitration award. During this time, LaFrance passed both mental and physical fitness-for-duty exams and was reinstated. The Guild appealed the summary judgment on the breach of contract claim, and the County appealed the denial of the writ of certiorari. The Court of Appeals held that the arbitration decision violated public policy because LaFrance had violated his duties as a deputy sheriff and could not serve in a position of public trust. Kitsap County Deputy Sheriff's Guild v. Kitsap County, 140 Wash.App. 516, 525-26, 165 P.3d 1266 (2007). The Guild appealed to this *678 court, contending that the arbitration decision should be upheld because it did not violate an explicit, well defined, and dominant public policy. The Guild also argues that the arbitration award ordered reinstatement of LaFrance, and that he is therefore entitled to back pay. We accepted review. Kitsap County Deputy Sheriff's Guild v. Kitsap County, 163 Wash.2d 1038, 187 P.3d 270 (2008).

ISSUES
¶ 6 1. Does an arbitration decision reinstating a deputy sheriff who has been found to be untruthful violate an explicit, well defined, and dominant public policy and must therefore be vacated?
¶ 7 2. Does the arbitration award qualify LaFrance for back pay?

STANDARD OF REVIEW
¶ 8 This case involves a question of law, which we review de novo. State v. Ford, 125 Wash.2d 919, 923, 891 P.2d 712 (1995).

ANALYSIS

I. The Public Policy Exception to the Enforcement of Arbitration Awards

A. Whether to Adopt the Public Policy Exception
¶ 9 This court will review an arbitration decision only in very limited circumstances, such as when an arbitrator has exceeded his or her legal authority. Clark County Pub. Util. Dist. No. 1 v. Int'l Bhd. of Elec. Workers, Local 125, 150 Wash.2d 237, 245, 76 P.3d 248 (2003). Reviewing an arbitration decision for mistakes of law or fact would call into question the finality of arbitration decisions and undermine alternative dispute resolution. Id. at 246, 76 P.3d 248. Further, a more extensive review of arbitration decisions would weaken the value of bargained for, binding arbitration and could damage the freedom of contract. See id. at 247, 76 P.3d 248 (holding that "[w]hen parties voluntarily submit to binding arbitration, they generally believe that they are trading their right to appeal an arbitration award for a relatively speedy and inexpensive resolution to their dispute").
¶ 10 Nonetheless, federal courts and many other state courts have held thatlike any other contractan arbitration decision arising out of a collective bargaining agreement can be vacated if it violates public policy. See E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17, 531 U.S. 57, 67, 121 S.Ct. 462, 148 L.Ed.2d 354 (2000) (holding that public policy did not prohibit an arbitration award reinstating a truck driver who tested positive for marijuana twice). This public policy exception is limited to decisions that violate an "`explicit,'" "`well defined,'" and "`dominant'" public policy, not simply "general considerations of supposed public interests." Id. at 62, 121 S.Ct. 462 (quoting W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am., 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983)).[4] In evaluating the arbitrator's decision, the federal courts treat the decision as if it were part of the contract. Id.
¶ 11 This court has not yet explicitly adopted the public policy exception, but historically, we have turned to federal case law for guidance in labor law cases. Clark County, 150 Wash.2d at 246 n. 7, 76 P.3d 248. In addition, several Court of Appeals cases in Washington have followed or made reference to the public policy exception. See Kennewick Educ. Ass'n v. Kennewick Sch. Dist. No. 17, 35 Wash.App. 280, 282, 666 P.2d 928 (1983) (vacating an arbitration decision that awarded punitive damages because it violated public policy); Local Union No. 77, Int'l Bhd. of Elec. Workers v. Pub. Util. Dist. No. 1, 40 Wash.App. 61, 66, 696 P.2d 1264 (1985) (noting that "public policy is a ground for refusing to enforce a collective bargaining *679 agreement" (emphasis omitted)). We now join the federal and other state courts in adopting the narrow public policy exception to enforcing arbitration decisions.

B. Whether the Arbitrator's Decision Violates an Explicit, Well Defined, and Dominant Public Policy
¶ 12 The lower court adopted the public policy exception and vacated the arbitration award, holding that reinstating LaFrance would violate RCW 36.28.010a statute describing the general duties of sheriffs. However, that statute has no provisions directly relating to the charges against LaFrance.[5] In its briefs to this court, the County no longer contends that RCW 36.28.010 represents a public policy against reinstating a police officer who has been found to be dishonest but instead points to state criminal statutes and the Brady[6] rule.

i. State Criminal Statutes
¶ 13 The County points to criminal statutes that prohibit anyone from knowingly making false statements to public servants or obstructing law enforcement officers, RCW 9A.76.175 and 9A.76.020, and those that prohibit public officers from knowingly making false statements in an official report or statement or committing misconduct, RCW 42.20.040 and 9A.80.010. However, these statutes do not provide an explicit, well defined, and dominant public policy prohibiting the reinstatement of any officer found to violate these statutes. Examples of explicit, well defined, and dominant public policies in comparable cases in other states include a statute prohibiting individuals who have committed felonies from serving as police officers, City of Boston v. Boston Police Patrolmen's Ass'n, 443 Mass. 813, 820, 824 N.E.2d 855 (2005) (vacating an arbitration award that reinstated a police officer who had falsely arrested two people and lied under oath about the arrests, classifying the officer's behavior as "felonious"); and the affirmative duty under federal statute to prevent sexual harassment by law enforcement officers, City of Brooklyn Center v. Law Enforcement Labor Services, Inc., 635 N.W.2d 236, 242-44 (Minn.App.2001) (vacating an arbitration award that reinstated a police officer who had a long history of stalking and sexual harassment while on duty). Washington has no similar statute prohibiting persons found to be untruthful from serving as officers or placing an affirmative duty on counties to prevent police officers from ever being untruthful.
¶ 14 Courts in other states have upheld similar arbitration decisions reinstating officers when there is no explicit, well defined, and dominant public policy against reinstatement, even when reinstatement would likely be contrary to general public policy considerations. See City of Highland Park v. Teamster Local Union No. 714, 357 Ill.App.3d 453, 466, 828 N.E.2d 311, 293 Ill.Dec. 341 (2005) (refusing to vacate an arbitration award that reinstated a police officer who had been found guilty of misdemeanor trespass to a vehicle in an off-duty incident, finding that there was no explicit, well defined, and dominant public policy requiring the automatic termination of an officer when he is found guilty of violating a law); Wash. County Police Officers' Ass'n v. Washington County, 187 Or.App. 686, 691-92, 69 P.3d 767 (2003) (refusing to vacate an arbitration award that reinstated a police officer who tested positive for marijuana and lied about his drug use, noting that the relevant statute only required termination of a police officer who had been convicted of unlawful use of a controlled substance). Washington statutes prohibit making false statements to a public officer but there is no statute or other explicit, well defined, and dominant expression of public policy that requires the automatic termination of an officer found to have been untruthful.

ii. The Brady Rule
¶ 15 The County contends that the Brady rulewhich requires prosecutors to disclose *680 exculpatory evidence[7]exemplifies a public policy against reinstatement of police officers found to be untruthful. The County argues that prosecutors would have to disclose LaFrance's record of dishonesty in any criminal proceedings where LaFrance served as a witness. However, even if that were true,[8] it would not be sufficient to vacate the arbitration decision because it does not constitute an explicit, well defined, and dominant public policy prohibiting LaFrance's reinstatement. The cases requiring disclosure of an officer's history of untruthfulness have not commented on whether such an officer could continue to be employed. As a result, there is no explicit (or even implicit) statement regarding the continued employment of an officer found to be untruthful. Further, even if Brady case law constituted a public policy against reinstatement of an officer found to be dishonest, it provides no guidance regarding what level of dishonesty would prohibit reinstatement. The Brady rule provides neither an explicit nor a well defined public policy against reinstating an officer found to be untruthful. As such, the Brady rule does not meet the exacting requirements necessary to void an arbitration award on public policy grounds.
¶ 16 The public policy discussed in the dissent fails to meet the strict standard of "explicit, well defined, and dominant." RCW 41.14.110 does require that deputy sheriffs serve only during good behavior but provides dismissal as one option among many, including suspension, demotion, or deprivation of vacation privileges.
¶ 17 The Court of Appeals erred when it vacated the arbitrator's award without explaining the explicit, well defined, and dominant public policy violated by that award. The parties negotiated a collective bargaining agreement and agreed that the arbitrator's decision would be final and binding. The arbitrator conditioned LaFrance's reinstatement on successful passage of the County's own physical and mental fitness-for-duty exams. Even if we were to agree that the arbitrator's decision was not good public policy and thought LaFrance's reinstatement distasteful, the County has failed to cite any explicit, well defined, and dominant public policy that requires vacating this award. We reverse the Court of Appeals and reinstate the award.

II. Interpreting the Arbitration Award
¶ 18 The Guild argues that LaFrance is owed retroactive wages, either from the date of his termination or the date of the arbitration award. The Guild contends that the arbitrator was only charged with determining whether the termination had just cause, and that his jurisdiction did not include the time period after LaFrance's termination. In the alternative, the Guild argues that the language of the award reverses the termination and therefore reinstates LaFrance to inactive duty.
¶ 19 As noted above, this court can review a decision if the arbitrator has exceeded his or her legal authority. Clark County, 150 Wash.2d at 245, 76 P.3d 248. Here, the jurisdiction of the arbitrator's award was limited to the issue, "Did the County discipline Brian LaFrance without just cause, and if so, what is the appropriate remedy?" CP at 39. The arbitrator, taking into account LaFrance's mental illness, determined that the County had just cause to issue three separate final written warnings, but not to terminate him. To remedy the situation, the arbitrator ordered that LaFrance be allowed to access benefits (such as sick leave and disability benefits) from the date of termination, but that he was not entitled to back pay. He also required LaFrance to pass fitness-for-duty exams prior to returning to full duty.
¶ 20 The arbitrator's decision to disallow back pay and require LaFrance to pass fitness-for-duty exams prior to returning is part of his determination of the proper remedy and does not exceed his scope of authority. In addition, the award clearly states that LaFrance "is not entitled to back pay per se, but may keep any Unemployment Insurance *681 benefits for which he is monetarily eligible." CP at 83. The Guild's argument that the arbitrator's decision actually requires awarding back pay to LaFrance is contrary to its plain language. LaFrance underwent physical and mental exams in March 2005, and the County reinstated him to full duty upon receipt of the positive results in April 2005. The County has complied with the arbitrator's decision, and we affirm the trial court's finding that LaFrance is not entitled to back pay.

CONCLUSION
¶ 21 The arbitrator's decision does not violate an explicit, well defined, and dominant public policy; therefore, we reverse the Court of Appeals and reinstate the arbitrator's decision. The County appropriately returned LaFrance to duty on April 11, 2005, upon passage of fitness-for-duty exams, so no retroactive pay is required.
WE CONCUR: Justice CHARLES W. JOHNSON, Justice BARBARA A. MADSEN, Justice RICHARD B. SANDERS, Justice DEBRA L. STEPHENS, and Justice TOM CHAMBERS.
J.M. JOHNSON, J. (dissenting).
¶ 22 Deputy Brian LaFrance committed numerous acts of misconduct, including dishonesty, mishandling evidence, and disobeying direct orders. Not surprisingly, the Kitsap County sheriff moved to terminate LaFrance. An arbitrator appointed to interpret the labor contract between deputies and the county determined that terminating LaFrance was too severe a penalty and required Kitsap County to reinstate LaFrance.[1] Kitsap County argues that the arbitrator's order to reinstate LaFrance is contrary to public policy and should not be enforced by the courts. I agree, and dissent from a majority that fails to discern the strong public policy against employing police officers with serious, documented dishonesty and misconduct.
¶ 23 Sheriff's Deputy LaFrance swore an oath to truly, faithfully, and impartially perform his duties, as does each such officer. Clerk's Papers (CP) at 520. Kitsap County terminated LaFrance only after he failed to comply with this oath. As the majority admits, his conduct frequently and dramatically violated the oath (and its underlying public policy, as shown below).[2] Majority at 676-77. Requiring the reinstatement to duty of a police officer such as LaFrance who has violated this oath and engaged in repeated misconduct undermines several clear public policy goals important to our legal system as well as the confidence of our citizens in that system. Under the public policy exception to the presumption in favor of enforcing results of arbitration, there is ample justification to vacate the decision of the arbitrator and sustain the county's decision to terminate LaFrance. Indeed, the courts cannot engage in violating important policy through ordinary *682 reinstatement of a disqualified officer. According, I dissent.
¶ 24 The majority admits that courts decline to enforce arbitration decisions that violate public policy. Majority at 678. This says nothing more than that the county must not, by other orders, directly violates public policy. Indeed, the United States Supreme Court has recognized that courts should not enforce arbitration awards that violate an "explicit," "well defined," and "dominant" public policy. United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 43, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987); W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am., 461 U.S. 757, 766, 103 S.Ct. 2177, 2183, 76 L.Ed.2d 298 (1983); see, e.g., Newsday, Inc. v. Long Island Typographical Union, No. 915, 915 F.2d 840, 844-45 (2d Cir.1990) (arbitration decision reinstating employee who sexually harassed co-workers should be vacated as contrary to public policy against sexual harassment).
¶ 25 The public policy exception is particularly important in cases such as this where courts are asked to review arbitration decisions involving public officials. The work and responsibility of public officials is being more heavily intertwined with public policy considerations than that of private persons or companies. Public policy considerations accordingly become more obviously important in cases involving public officials such as the sheriff and Deputy LaFrance, who are integrally involved in our legal system and the protection of citizens and their rights.
¶ 26 After examining the entirety of the case law from which the public policy exception originates, I disagree with the majority's conclusion that there is no explicit, well defined, and dominant public policy against requiring Kitsap County and its elected sheriff to employ a dishonest and disobedient deputy. Majority at 680. In reaching its conclusion on this issue, the majority seems to be laboring under the misconception that an "explicit" public policy may be derived only from statutory language. Id. at 679. This assumption is mistaken. Although some case law lends support to the majority's analysis, all such language in cases upon which the majority relies is rooted in an older case, Muschany v. United States, 324 U.S. 49, 65 S.Ct. 442, 89 L.Ed. 744 (1945), which more fully describes the standard. See United Paperworkers, 484 U.S. at 43, 108 S.Ct. 364 (quoting W.R. Grace & Co., 461 U.S. at 766, 103 S.Ct. 2177 (quoting Muschany, 324 U.S. at 66, 65 S.Ct. 442)).
¶ 27 In Muschany, landowners challenged the United States' repudiation on public policy grounds of contracts which bound the government. 324 U.S. at 54, 65 S.Ct. 442. The Supreme Court, in discussing whether the government had a valid public policy justification for doing so, stated that "[o]nly dominant public policy would justify" repudiation. Id. at 66, 65 S.Ct. 442. The Court clarified that "[p]ublic policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." Id. However, the Supreme Court also suggested that public policy can originate from "a plain indication of that policy through long governmental practice" or from "obvious ethical or moral standards." Id. at 66-67, 65 S.Ct. 442. Thus, according to the seminal case upon which the authorities cited by the majority rely, controlling public policies may be derived not just from statutes but from other important legal and constitutional principles outside of statute.
¶ 28 I have no difficulty identifying in many sources the public policies violated by enforcement of an arbitrator's decision requiring the reinstatement of an incompetent, insubordinate, and confirmedly dishonest deputy. Requiring Kitsap County to employ such a deputy violates long standing Washington policies and runs counter to obvious ethical standards per the terms of Muschany. This renders the arbitration decision to require reinstatement contrary to public policy.
¶ 29 Before going further, it bears note that the public policies violated in this case are violated by the arbitrator's decision to require reinstatement and the enforcement of that decision by the courts, not by the misconduct of LaFrance, reprehensible though his behavior may be. This comports with the direction in Eastern Associated Coal Corporation v. United Mine Workers of America, District 17, 531 U.S. 57, 62-63, 121 *683 S.Ct. 462, 467, 148 L.Ed.2d 354 (2000), to evaluate in cases such as this "not whether [the employee's conduct] itself violates public policy, but whether the agreement to reinstate him does so." It also echoes the warning given by a federal court in Washington in Columbia Aluminum Corp. v. United Steelworkers of Am., Local 8147:
"If a court relies on public policy to vacate an arbitral award reinstating an employee, it must be a policy that bars reinstatement. Courts cannot determine merely that there is a "public policy" against a particular sort of behavior in society generally and, irrespective of the findings of the arbitrator, conclude that reinstatement of an individual who engaged in that sort of conduct in the past would violate that policy."
922 F.Supp. 412, 420 (E.D.Wash.1995) (quoting Stead Motors v. Auto. Machinists Lodge No. 1173, 886 F.2d 1200, 1212-13 (9th Cir. 1989)). Here, strong public policy is violated by mandating the reinstatement of a deputy sheriff who has conducted himself in the manner such as LaFrance's.
¶ 30 The first of these policies is actually reflected in our statute law. This policy was restated by the voters more than half a century ago through adoption of Initiative 23 (I-23), now codified in chapter 41.14 RCW. The initiative provides that the tenure of deputy sheriffs "shall be only during good behavior" and that they may be dismissed, inter alia, for such transgressions as incompetency, dishonesty, insubordination, or willful failure to conduct themselves in a manner befitting a deputy sheriff. RCW 41.14.110. To enforce this policy, the initiative established "a merit system of employment for county deputy sheriffs and other employees of the office of county sheriff, thereby raising the standards and efficiency of such offices and law enforcement in general." Id.
¶ 31 Expecting deputy sheriffs to meet high standards of conduct and performance was not new to Washington at the time of I-23. Rather, it was a governmental policy that evidenced the value to our populace of promoting the twin public policies of efficiency and excellence in law enforcement. Employing a deputy who fails to meet these high standards through dishonesty or misconduct, on the other hand, has no such foundation in our legal heritage. A court decision upholding an order of reinstatement thus contradicts long standing government practice and violates the public policies that motivated I-23 so many years ago. As such, it should be vacated.
¶ 32 A second clear public policy violated by the arbitrator's decision is found in our constitution. In Washington, sheriffs are constitutional officers elected by the public. WASH. CONST. art. XI, § 5. The constitutional, elected status of the office has important ramifications regarding who may discharge the duties of a county sheriff:
"[T]he framers ..., in providing for the election of these officers by the people, thereby reserved unto themselves the right to have the inherent functions theretofore pertaining to said offices discharged only by persons elected as therein provided. The naming of these officers amounted to an implied restriction upon legislative authority to create other and appointive officers for the discharge of such functions.... If these constitutional offices can be stripped of a portion of the inherent functions thereof, they can be stripped of all such functions, and the same can be vested in newly created appointive officers, and the will of the framers of the constitution thereby thwarted."
State ex rel. Johnston v. Melton, 192 Wash. 379, 390, 73 P.2d 1334 (1937) (emphasis added) (quoting Ex parte Corliss, 16 N.D. 470, 114 N.W. 962, 964 (1907)). Similarly, a later court indicated that:
"[T]he powers thus granted are powers which the people of the state expressly provided in the constitution should be executed only by persons elected by themselves. The people are the source of all governmental power, and, in setting up a constitutional government, they provided that certain of their powers should be exercised through county governments, governments close to the people; and they further provided, in § 5 of Art. 11 of the constitution, that the powers to be thus exercised through county governments should be exercised only through officials *684 elected by themselves. In § 5 of Art. 11, they named the officers whom they then thought needful, [including] county ... sheriffs...."
Fritz v. Gorton, 83 Wash.2d 275, 325, 517 P.2d 911 (1974) (emphasis added) (quoting State ex rel. Johnston, 192 Wash. at 385, 73 P.2d 1334).
¶ 33 This court, in the passages quoted above, indicates that the powers of constitutional officers such as county sheriffs may be executed only by those elected to hold those offices and officers designated or deputized by them. With respect to county sheriffs, these powers include a statutorily defined set of duties, including, inter alia, the duties to execute warrants, defend the county against those who would endanger public safety, keep the peace, and make complaint of all violations of the law which come to their knowledge. RCW 36.28.010, .011. In executing these duties, sheriffs may "call to their aid such ... power of their county as they may deem necessary." RCW 36.28.010(6).
¶ 34 LaFrance's acts of misconduct certainly did not aid the Kitsap County sheriff to perform his duties. In fact, LaFrance's failure to properly handle evidence, secure arrest warrants, and file charges in several cases impaired the sheriff's performance. If the sheriff has the power to perform his duties, then he must have the power to prevent others in his employ from hindering his performance of those duties. Thus, the Kitsap County sheriff exercised his powersthe exclusive powers of a constitutional officer when he, under the auspices of Kitsap County, terminated LaFrance for documented misconduct that interfered with the sheriff's performance. That the judgment of a county sheriff with respect to a core matter such as whom to deputize should now be overturned by the decision of an unelected arbitrator, runs contrary to the policy analyses of the cases of this court cited and quoted above. Those cases articulate the policy that constitutional officers have exclusive authority to exercise powers of their offices. It unmistakably violates the public policy articulated by those cases, that of preserving for constitutional officers the core duties and powers delegated, to allow an arbitrator (or a court) to force reinstatement here.
¶ 35 Another public policy grounded in fundamental aspects of our constitutional system and violated by the decision requiring reinstatement becomes apparent when one reflects further that the office of sheriff is an elected position. Our electoral system ensures that public officials effectively execute their duties, including terminating incompetent or dishonest employees such as LaFrance, by giving voters a clear-cut mechanism to check performance. If a public official fails to execute his duties properly, the public can simply vote him out of office.[3] Here, by usurping the county sheriff's control over a seriously misbehaving staff member, an unelected arbitrator (as approved by this court's majority), deprives the public of the opportunity to hold its officials accountable. The voters of Kitsap County cannot vote the arbitrator out of office to express their disapproval of LaFrance's reinstatement. As a result, the decision requiring reinstatement of LaFrance violates a public policy inherent in our democratic design that favors enabling the electorate to hold constitutional officers accountable. It is difficult to imagine public policies of greater value or authority than our constitution and electoral system. These are not only "general considerations of supposed public interests," Muschany, 324 U.S. at 66, 65 S.Ct. 442, but the very foundation of our form of government.
¶ 36 Another source of public policy violated by the decision requiring reinstatement of LaFrance is illuminated by consideration of the effect on law enforcement if such an officer is employed by Kitsap County. In criminal prosecutions, the state must disclose material information to the defense. Indeed, the United States Supreme Court has held that failure by the prosecution to disclose such material violates due process, leading to reversal. Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); State v. Thomas, 150 Wash.2d 821, 850, 83 *685 P.3d 970 (2004). This may often require county prosecutors to disclose evidence that tends to negate the guilt of the accused, including impeachment evidence related to the credibility of parties who testify against the accused at trialhere, the officer charged with investigating a crime. See State v. Benn, 120 Wash.2d 631, 650, 845 P.2d 289 (1993) ("`[i]mpeachment evidence... as well as exculpatory evidence, falls within the Brady rule'" (alterations in original) (quoting United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985))). This arguably includes evidence of discipline for misconduct or untruthfulness related to any officer who is a witness. See, e.g., United States v. Bland, 517 F.3d 930, 934 (7th Cir.2008) (internal investigation of police officer for misconduct should be disclosed); United States v. Holt, 486 F.3d 997, 1001 (7th Cir.2007) (police officer's reputation for untruthfulness is admissible at trial).
¶ 37 LaFrance has a documented history of dishonesty and misconduct, a disciplinary history that poses a serious problem for the Kitsap County Sheriff's Office. This history must be disclosed and may be used to impeach if LaFrance testifies in any criminal proceedings. As pointed out by three amici with special expertise on the subject matterthe Washington Association of Prosecuting Attorneys, the Washington State Association of Municipal Attorneys, and the Attorney Generalthis compromises any use of LaFrance to testify, see, e.g., Amicus Curiae Brief of the Attorney General at 9, thus likely preventing him from performing the most essential functions of his job as a law enforcement officer, id. at 10.
¶ 38 It is axiomatic that a public employee incapable of performing his job may be terminated regardless of disabilities such as the mental health issues suggested of LaFrance. See RCW 49.60.180 (Washington Law Against Discrimination does not prohibit termination if the disability prevents the employee from properly performing his or her job); Havlina v. Wash. State Dep't of Transp., 142 Wash.App. 510, 517, 178 P.3d 354 (2007) (citing Dedman v. Wash. Pers. Appeals Bd., 98 Wash.App. 471, 486, 989 P.2d 1214 (1999) (same)). In keeping with this policy, the Kitsap County sheriff acted properly when he terminated LaFrance. It is objectively impossible to accommodate LaFrance in order to enable him to perform his job as a deputy sheriff: LaFrance's documented misconduct and dishonesty cannot be purged from files or denied to enable him to testify without being impeached. The arbitrator's decision mandating reinstatement of LaFrance thus forces Kitsap County to employ an incompetent employee, an outcome clearly at odds with the public policy goal articulated above. This contradiction alone warrants vacation of the decision.
¶ 39 Finally, it is also important to consider policies derived from "obvious ethical and moral standards" which the reinstatement violates. Muschany, 324 U.S. at 66-67, 65 S.Ct. 442. Public law enforcement officers are necessarily endowed with a great deal of moral authority and public trust. As "`a trustee of the public interest,'" Seattle Police Officers' Guild v. City of Seattle, 80 Wash.2d 307, 312, 494 P.2d 485 (1972) (quoting Gardner v. Broderick, 392 U.S. 273, 277, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968)), an officer must demonstrate "a high level of trustworthiness and personal integrity," O'Hartigan v. Dep't of Pers., 118 Wash.2d 111, 123, 821 P.2d 44 (1991). It is especially important that law enforcement agencies "must be free from corruption and employ persons of integrity if they are to function effectively." Id. These cases evidence the strong public policy in favor of promoting honesty and integrity in law enforcement employees, the goal of this policy being the encouragement of public trust in law enforcement. This policy goal is firmly grounded in "obvious ethical and moral standards," which, as indicated by Muschany, constitute one permissible source from which to ascertain public policy. Muschany, 324 U.S. at 66-67, 65 S.Ct. 442.[4]
¶ 40 Even the arbitrator held that LaFrance has demonstrated neither honesty nor *686 integrity as a deputy sheriff, finding him "guilty of much more than a few isolated episodes of untruthfulness." CP at 77. One example is in this record: L.S. was the victim of a burglary whose case was seriously or totally neglected by LaFrance.[5] CP at 53. Reinstatement of an officer like LaFrance conflicts with the paramount policy of fostering public trust in law enforcement. No other remedy than removal would adequately preserve the special moral stature of law enforcement officials in our criminal justice system.
¶ 41 The majority concludes that these public policy considerations do not satisfy the public policy exception as described in W.R. Grace & Co. and United Paperworkers because they are not sufficiently explicit, well defined, and dominant. Majority at 678-79. However, the majority reads the test far too narrowly. The precedent upon which those cases rely in forming the public policy exception supports a much broader conception of public policy, see Muschany, 324 U.S. at 66, 65 S.Ct. 442, one that encompasses the constitutional, statutory and morally derived policies discussed above.

CONCLUSION
¶ 42 The arbitrator's decision requiring Kitsap County to reinstate a deputy sheriff, who was found to be not only incompetent, but also untruthful, violates important public policies and should be vacated. That the courts would enforce an order requiring employment of a deputy sheriff who committed numerous acts of misconduct, including dishonesty, mishandling evidence, and disobeying direct orders, greatly offends the public policies of this state. Rather than sign such an opinion, I respectfully dissent.
WE CONCUR: Chief Justice GERRY L. ALEXANDER and TERESA C. KULIK, Justice Pro Tem.
NOTES
[1] CP at 38-84.
[2] The arbitrator found that the County had shown that (1) LaFrance was given warning, (2) the rules were reasonable, (3) the County made an effort to establish whether the violations had occurred, (4) the County's investigation was fair, (5) there was substantial evidence that LaFrance was guilty, and (6) the termination was not discriminatory. CP at 75-77.
[3] Prior to the arbitration, LaFrance had a heart attack, resulting in a delay in the arbitration. CP at 80.
[4] The dissent is correct that the Muschany case in 1945 implied there could be violations of public policy through "violations of obvious ethical or moral standards." Muschany v. United States, 324 U.S. 49, 66-67, 65 S.Ct. 442, 89 L.Ed. 744 (1945). The current standard set forth by the United States Supreme Court, however, is that a public policy must be explicit, well defined, and dominant for a court to overturn an arbitration decision. E. Associated Coal Corp., 531 U.S. at 62, 121 S.Ct. 462.
[5] The duties listed in RCW 36.28.010 include arresting persons guilty of public offenses, executing warrants and orders of the courts, preserving the peace, and defending the County against those who endanger public safety.
[6] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[7] Brady, 373 U.S. at 87, 83 S.Ct. 1194.
[8] The Guild contends that a prosecutor would not have to reveal LaFrance's history under Brady because the arbitrator did not find that LaFrance was deliberately untruthful. Pet'r's Suppl. Br. at 15.
[1] Subject to passing a fitness exam.
[2] The arbitrator found that LaFrance committed multiple acts of misconduct while handling warrants and investigating cases for Kitsap County during his tenure, including failure to follow direct orders, failure to properly handle evidence, failure to secure arrest warrants, and failure to file charges. CP at 60-63. LaFrance was also found to have kept pornographic evidence in the trunk of his car and downloaded and transferred pornographic images onto computers belonging to Kitsap County and to the Kitsap County Sheriff's Office. CP at 62. LaFrance was repeatedly dishonest when questioned about his actions and lied about evidence that had been entrusted to his possession. CP at 53-54. The arbitrator ultimately found that the vast weight of evidence established that LaFrance was guilty of both misconduct and incompetence. CP at 76. The arbitrator furthermore agreed that LaFrance had engaged in serious acts of misconduct sufficient to warrant his discharge. CP at 81. Nevertheless, the arbitrator ruled that termination was too harsh a penalty because LaFrance's supervisor should have recognized that LaFrance's misconduct evidenced a mental health problem and referred him for mental health and fitness exams; the arbitrator reached this conclusion despite the fact that LaFrance himself had no idea of the problem and did not raise it in his defense until well after his termination. CP at 81-82. The arbitrator noted that, had the burden been on LaFrance to show that a reasonable employer would have known of his alleged disability, his findings "would have been different." CP at 80 n. 74.
[3] See also WASH. CONST. art. I, § 33 (providing for recall of an elected public officer and his replacement by special election "whenever ... such officer has committed some act or acts of malfeasance or misfeasance while in office, or who has violated his oath of office ...").
[4] The public policy favoring honesty and integrity in law enforcement officials can also be found in our statutory law, which states that "[e]very public officer who shall knowingly make any false or misleading statement in any official report or statement, under circumstances not otherwise prohibited by law, shall be guilty of a gross misdemeanor." RCW 42.20.040.
[5] L.S. phoned several times to ask LaFrance about the status of her case. CP at 53. Deputy LaFrance did not return any of her calls, despite assuring others in the office that he had done so. Id. at 53-54.