[No. 63024-5-I.   Division One.   May 3, 2010.]

THE CITY OF SEATTLE POLICE DEPARTMENT, *Appellant*, v. THE CITY OF SEATTLE PUBLIC SAFETY CIVIL SERVICE COMMISSION ET AL., *Respondents*.

880

*Peter S. Holmes, City Attorney,* and *Erin L. Overbey, Assistant,* for appellant.

*Peter S. Holmes, City Attorney,* and *Gary E. Keese, Assistant,* for respondent.

¶1 ELLINGTON, J. — Seattle police officer Richard Roberson was suspended for 30 days as discipline for three incidents of misconduct. The Seattle Public Safety Civil Service Commission (Commission) found that discipline was justified for only one of the incidents and reduced the suspension to 7 days.

¶2 The question raised here is whether the review standard employed by the Commission is inconsistent with the statute establishing the city police civil service system and The 1978 City of Seattle Public Safety Civil Service Ordinance, both of which provide that review is confined to determining whether discipline was "in good faith for cause."[1] We hold it is not and affirm.

---

[1] RCW 41.12.090; Seattle Municipal Code (SMC) 4.08.100.

## FACTS

¶3 As of 2005, Officer Richard Roberson was a 12 year veteran of the Seattle Police Department (SPD) with a significant disciplinary history. Three incidents occurred that year, leading Chief Kerlikowski to suspend Roberson for 30 days.[2]

¶4 The first incident involved allegations that Roberson failed to take appropriate action in response to a report of attempted theft. A woman called to report a possible burglary in the secured garage of a residential building she managed. Roberson responded to the call and met with the woman at the building. She told him that a man had entered the garage, attempted to remove a bag from her motorcycle, and then attempted to block the garage door open with a card. The woman told Roberson the incident had been caught on surveillance video, and that the video, the garage, and the motorcycle were available for inspection. She also told Roberson the man had come into the building with a tenant's invited guest and the tenant could provide his name.

¶5 Officer Roberson concluded that no crime had occurred because the suspect had not broken into the garage and "there's no such [crime] as attempted theft."[3] Roberson did not view or request a copy of the video; he did not investigate the scene; he did not take the name of the tenant whose guest accompanied the suspect into the building; and he did not write a report.

¶6 Several days later, the woman showed an SPD captain still shots from the surveillance video. The captain ordered further investigation. The intruder was identified and pleaded guilty to attempted theft.

---

[2] The Commission's findings of fact are not challenged and are therefore verities on appeal. *Butner v. City of Pasco*, 39 Wn. App. 408, 411, 693 P.2d 733 (1985). We draw our description of the incidents from the findings.

[3] Clerk's Papers at 390.

¶7 The second incident involved allegations of mishandling and failing to safeguard evidence. Roberson responded to a report of a suspect in custody at the Capitol Hill public library for trespass and possible narcotics possession. When Roberson arrived, he learned from library security guards that they had found five or six "rocks" of crack cocaine when searching the suspect's backpack for weapons. Although Roberson thought the rocks were not usable as evidence because he believed the search was unlawful, he seemed satisfied with the guards' explanation that they searched the backpack for weapons. Roberson then searched the backpack for weapons himself. He found a crack pipe and a taser.

¶8 Roberson wrote the suspect a trespass admonishment. On the back of the trespass admonishment card, Roberson wrote, "[S]trong odor of crack smoking. No crack found on suspect."[4]

¶9 Roberson took the suspect to the patrol car to field test the substance. He placed the rocks on the dashboard. The day was hot, and when he handled the rocks a few minutes later, they were soft to the touch. Based on the texture, Roberson concluded the rocks were "bunk" (fake narcotics) and threw them away. He allowed the suspect to leave the scene. At the precinct, Roberson also threw away the pipe because he felt it did not contain enough residue to test. In the event history section of his report he wrote, "No crack found but found small amount broke up wax. He might try to sell it as crack."[5]

¶10 The third incident involved allegations of insubordination and lack of professionalism. On August 2, 2005, in the last hour of his shift, Roberson sent the dispatcher a computer message asking for a half hour meal break (a "931"). The dispatcher told Roberson she could not give him a 931 because he needed to respond to a 911 hang up call, which has high priority. Roberson replied that he was

---

[4] Clerk's Papers at 439.

[5] Clerk's Papers at 436.

"going out on a premis[e]."[6] The dispatcher replied, "Do whatever [you] have to do. I just can't give [you] a 931."[7] Roberson then logged himself out on a nonemergency premise check to a park. The chief dispatcher immediately contacted Sergeant Guballa, Roberson's supervisor, who ordered Roberson to respond to the 911 hang up call. Roberson did so.

¶11 Guballa had asked his squad not to take 931 breaks after 18:15 p.m. in order to ensure officer availability at the end of the second watch shift. One officer testified he had heard Guballa issue the order; other officers either did not remember it or considered it a request. Roberson acknowledged Guballa personally told him before the incident about the 931 breaks, but he did not consider it an order.

¶12 In setting the discipline for these incidents, Chief Kerlikowski considered Roberson's disciplinary record and how it compared to that of other officers. In 2001, Roberson was given a verbal reprimand for failing to take appropriate action when two women came to the precinct to report a rape in which one of them was the victim. Roberson's communications with the women resulted in their feeling that SPD was not concerned about the rape incident. In 2002, Roberson was suspended for two days, transferred to another precinct, and ordered to undergo training for administering corporal punishment to an eight year old runaway child whose mother gave Roberson permission to discipline him. Roberson was ordered to not have contact with the child. He ignored that order, had contact with the child, and in several instances administered corporal punishment to him. For this, Roberson was suspended for five days and was ordered to not have contact with the child except through a third party agency. In all, Roberson had been disciplined three times in the preceding four years, for a total of six offenses in five years. This exceeded the record of any other SPD officer during a similar period of time.

---

[6] Clerk's Papers at 578.

[7] Clerk's Papers at 579.

¶13 Roberson appealed to the Commission. The Commission found SPD had just cause to discipline Roberson for the garage incident, but found no just cause to discipline him for the other two incidents.

¶14 As to the library incident, the Commission observed that the SPD manual authorizes, but does not require, officers to take possession of an item they reasonably suspect is evidence of a crime. Officers have discretion "to make reasonable determinations regarding whether to 'detain' property and if they do, to 'screen' the property for reasonable suspicion that it is evidence of a crime."[8] Relying on testimony from several officers that they routinely destroy crack pipes, and on Roberson's testimony regarding the softening of the rocks and the amount of residue on the pipe, the Commission concluded Roberson acted reasonably in the library incident.

¶15 Considering the 911 call incident, the Commission acknowledged that the SPD manual provides, "In all matters of deployment of field units, the Communications Dispatcher speaks as the voice of, and with the authority of, the Chief of Police."[9] The Commission concluded, however, that "while clearly not giving [Roberson] a 931,"[10] the dispatcher did not order him not to take the 931 break; and that when ordered by Guballa to respond to the 911 call, Roberson did so. The Commission concluded Roberson was not insubordinate.

¶16 The Commission considered Roberson's disciplinary history to be of limited relevance, finding the prior violations "substantially different" and "unique circumstances [because they] both involved Roberson's sincere belief that he was helping the people involved and was not harming the Department."[11]

---

[8] Clerk's Papers at 329.

[9] Clerk's Papers at 330.

[10] *Id.*

[11] Clerk's Papers at 333-34.

¶17 The Commission eventually imposed a seven day suspension for the garage incident.[12] Both Roberson and SPD appealed to superior court, which affirmed the Commission.

## ANALYSIS

### *Standard of Review*

██ ¶18 Our review is limited to determining whether the Commission "acted arbitrarily, capriciously, or upon an inherently wrong basis."[13] SPD contends the Commission applied the wrong legal standard in deciding Roberson's appeal. An agency action is based upon an inherently wrong basis when it applies the wrong legal standard in reaching its decision.[14]

### *Legislative Background*

██ ¶19 Washington's civil service for city police statute, chapter 41.12 RCW, was enacted in 1937. Its purpose is to establish a prototype law enforcement civil service system that protects employees against arbitrary and discriminatory discipline and ensures the public is served by qualified law enforcement officers by providing for merit-based promotion and tenure.[15] The statute authorizes creation of a civil service commission to review claims of improper discipline.[16] The statute demands that covered

---

[12] One commissioner dissented. He believed SPD sustained its burden of proof as to all three incidents. He also believed the garage incident by itself, and principles of progressive discipline, warranted at least a 10 day suspension.

[13] *Butner*, 39 Wn. App. at 411. To make this determination, appellate courts independently review the administrative record, independent of the trial court's findings. *Id.*

[14] *See State ex rel. Perry v. City of Seattle*, 69 Wn.2d 816, 817-18, 420 P.2d 704 (1966).

[15] *Seattle Police Officers Guild v. City of Seattle*, 151 Wn.2d 823, 831, 92 P.3d 243 (2004).

[16] *Id.*; RCW 41.12.030, .040, .090.

employees serve "only during good behavior,"[17] but also demands that discipline be imposed only "in good faith for cause."[18]

¶20 The statute authorizes cities to enact their own civil service systems, provided that they "substantially accomplish the purpose" of the chapter.[19] Pursuant to that authority and to authority granted by its charter, Seattle enacted The 1978 City of Seattle Public Safety Civil Service Ordinance "to establish a civil service system for employees in the Police and Fire Departments of the City, governing appointments, promotions, promotional testing, layoffs, recruitment, retention, classifications, removals and discipline, pursuant to Charter Article XVI, in substantial compliance with RCW Chapters 41.08, 41.12, 41.56."[20]

¶21 The ordinance largely parallels the statute. Public safety employee tenure "shall be only during good behavior and acceptable job performance, and any such employee may be removed, suspended, demoted, or discharged for cause."[21] Any employee may request review of discipline by the Commission. The commission hearing "shall be confined to the determination of the question of whether such removal, suspension, demotion, or discharge was made in

---

[17] RCW 41.12.080.

[18] RCW 41.12.090 ("No person in the classified civil service who shall have been permanently appointed or inducted into civil service under provisions of this chapter, shall be removed, suspended, demoted or discharged except for cause . . . . Any person so removed, suspended, demoted or discharged may within ten days from the time of his or her removal, suspension, demotion or discharge, file with the commission a written demand for an investigation, whereupon the commission shall conduct such investigation. The investigation shall be confined to the determination of the question of whether such removal, suspension, demotion or discharge was or was not made for political or religious reasons and was or was not made in good faith for cause.").

[19] RCW 41.12.010.

[20] SMC 4.08.020.

[21] SMC 4.08.100. The provision parallels statutory language regarding employees' rights: "Employees shall not be demoted, suspended, or discharged except only for cause, and they may appeal such adverse action as specified in this chapter." SMC 4.08.140(C).

good faith for cause."[22] The Commission may affirm, reverse, or modify the disciplinary order.[23]

¶22 The 1978 ordinance also authorized the Commission to "[m]ake suitable rules to carry out the purposes of [the public safety civil service system] and for examination, appointments, promotions, transfers, demotions, reinstatements, suspensions, layoffs, discharges, and any other matters connected with the purposes of this chapter."[24] The Commission adopted its rules of practice and procedure in 1980.

¶23 Under the commission rules, civil service employees may be disciplined "for good cause."[25] In an appeal to the Commission, the disciplining authority has the burden of showing that its action was "in good faith for cause."[26] The Commission issues findings of fact, conclusions of law, and such remedial orders as it deems appropriate.[27]

¶24 "In good faith for cause" is not defined by chapter 41.12 RCW, the 1978 ordinance, or the commission rules.

### "For Cause" vs. "Just Cause"

■ ■ ¶25 In reviewing Roberson's discipline, the Commission stated that its task was to determine whether "the thirty-day suspension was 'in good faith for cause' ('just cause')."[28] To assess just cause, the Commission considered several factors, including whether

(1) the employee had notice that his or her conduct would result in disciplinary consequences; (2) the rule was reasonable; (3)

---

[22] SMC 4.08.100.

[23] *Id.*

[24] SMC 4.08.070(A).

[25] Seattle Pub. Safety Civil Serv. Comm'n, Rules of Practice and Procedure rules 5.01, .03, .05 (2010) (Commission Rule).

[26] Commission Rule 6.21.

[27] Commission Rule 6.29.

[28] Clerk's Papers at 312.

the employer investigated to determine whether the rule was in fact violated; (4) the investigation was fair; (5) the employer's decision-maker had substantial evidence that the employee violated the rule as charged; (6) the employer applies its rules even-handedly; and (7) the discipline administered was fair in relation to the nature of the offense and imposed with regard to the employee's past work record.[29]

The Commission thus adopted the "seven tests" analysis articulated by labor arbitrator Carroll R. Daugherty in 1964, now widely used to guide arbitrations under collective bargaining agreements.[30]

¶26 SPD contends this "just cause" analysis is not the "in good faith for cause" standard required by the ordinance and the statute, that the two standards have differing histories and purposes, and that the Commission's adoption of the labor standard usurps the discretion of the department to evaluate misconduct.

¶27 Our Supreme Court has held that the two standards are different for purposes of res judicata analysis. In *Civil Service Commission of City of Kelso v. City of Kelso*,[31] the issue was exactly that: whether the two standards are the same. Res judicata barred a Kelso police officer from challenging his discipline in arbitration after the civil service commission issued a final order. The court acknowledged that no precise definition of the "for cause" standard exists but noted that the standard "ha[d] not previously been interpreted to require the Commission to consider any factors apart from the particular allegation of wrongdoing and the employer's motivation for the disciplinary ac-

[29] *Id.*

[30] *See In re Grief Bros. Cooperage Corp.*, 42 Lab. Arb. Rep. (BNA) 555, 557-59 (1964). The Supreme Court referenced the seven tests or factors in *Civil Service Commission v. City of Kelso*, 137 Wn.2d 166, 173, 969 P.2d 474 (1999); the factors are listed in *Kitsap County Deputy Sheriff's Guild v. Kitsap County*, 140 Wn. App. 516, 519-20, 165 P.3d 1266 (2007), *rev'd*, 167 Wn.2d 428, 219 P.3d 675 (2009).

[31] 137 Wn.2d 166, 969 P.2d 474 (1999).

tion."[32] The court observed that by contrast, just cause involves a more expansive inquiry:

> "Just cause" is a term of art in labor law, and its precise meaning has been established over 30 years of case law. Whether there is just cause for discipline entails much more than a valid reason; it involves such elements as procedural fairness, the presence of mitigating circumstances, and the appropriateness of the penalty. Seven factors are considered in determining whether there was just cause for discipline, including whether the employer applied its rules even-handedly, and whether the degree of discipline was reasonably related to the seriousness of the infraction given the employee's record of service.[33]

Because of the differing nature of the two standards and the fact that the first decision was made under the narrower test, the court refused to hold that res judicata barred the officer's second challenge under the bargaining agreement.

¶28 In *Baldwin v. Sisters of Providence in Washington, Inc.*,[34] our Supreme Court held that in the noncollective bargaining arena,

> "just cause" is a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power. We further hold a discharge for "just cause" is one which is not for any arbitrary, capricious, or illegal reason and which is one based on facts (1) supported by substantial evidence and (2) reasonably believed by the employer to be true.[35]

The *Baldwin* court rejected a just cause standard examining only the subjective good faith of the employer, and instead required the employer to show an objectively reasonable belief that the evidence established misconduct.[36]

---

[32] *Id.* at 173.

[33] *Id.* (citation omitted).

[34] 112 Wn.2d 127, 769 P.2d 298 (1989).

[35] *Id.* at 139.

[36] *Id.* at 138-39.

¶29 SPD contends the seven factor just cause test fails to address one of the principal objectives of officer discipline—public safety—and urges the correct test is that articulated in *Baldwin*. The Commission responds that *Baldwin* is not controlling, "certainly not to the exclusion of the seven-factors analysis."[37] The Commission takes the position that its discretion extends to adoption of a respected analytical tool for its review of officer discipline.[38]

¶30 SPD makes a persuasive argument that the chief of police must be able to hold officers to a high standard and to consider whether the officer's conduct harms the public service, and that the chief's judgments must be respected by the Commission. But the city police civil service statute places great discretion in the Commission as well. It provides that the tenure of police officers "shall be only during good behavior"[39] and that officers may be disciplined or discharged for any action or inaction indicating unfitness for employment in the public service:

(1) Incompetency, inefficiency or inattention to or dereliction of duty;

(2) Dishonesty, intemperance, immoral conduct, insubordination, discourteous treatment of the public, or a fellow employee, or any other act of omission or commission tending to injure the public service; or any other willful failure on the part of the employee to properly conduct himself or herself; or any willful violation of the provisions of this chapter or the rules and regulation to be adopted hereunder;

(3) Mental or physical unfitness for the position which the employee holds;

(4) Dishonest, disgraceful, immoral or prejudicial conduct;

(5) Drunkenness or use of intoxicating liquors, narcotics, or any other habit forming drug, liquid or preparation to such

---

[37] Br. of Resp't at 11.

[38] The Commission points out that city of Seattle personnel rules, which apply to city employees outside law enforcement, provide for consideration of five factors to assess "justifiable cause" for discipline or discharge, and argues those factors are analogous to the seven factor test. As these employees are not police officers, however, this observation is unhelpful.

[39] RCW 41.12.080.

extent that the use thereof interferes with the efficiency or mental or physical fitness of the employee, or which precludes the employee from properly performing the function and duties of any position under civil service;

(6) Conviction of a felony, or a misdemeanor, involving moral turpitude;

(7) Any other act or failure to act which *in the judgment of the civil service commissioners* is sufficient to show the offender to be an unsuitable and unfit person to be employed in the public service.[40]

¶31 The essential question here is whether, in an area where the legislative bodies have not defined their terms, the body appointed to administer the statute has discretion to do so. We believe it does, so long as its determination is reasonable, and we cannot say that adoption of the stricter test is not reasonable.

¶32 Whatever be the effect of the Commission's test on res judicata analysis, we do not read *Kelso* as requiring the Commission to adopt any particular test, and we see nothing in the legislation to assist the Commission in determining whether "in good faith for cause" is more like "just cause" in the labor arena or "just cause" in private employment.

¶33 SPD argues the Commission should limit its inquiry to whether there was cause for discipline and defer to the chief of police as to the degree of discipline to be imposed. But the 1978 ordinance explicitly states that the Commission may modify the discipline,[41] and the statute confers wide discretion upon the Commission under its authority.

¶34 Further, it is unclear what effect the seven factors test had on the Commission's review here. The Commission found two violations were not established. Its findings are not challenged. The only germane issue, then, is the change in the discipline imposed. As noted above, this is explicitly within the Commission's powers under the ordinance.

---

[40] RCW 41.12.080 (emphasis added).

[41] SMC 4.08.100.

¶35 The city charter, and indirectly the state legislature, bestowed upon the Commission, not the court, the authority to implement the 1978 ordinance and accomplish the purposes of chapter 41.12 RCW. The orders of the superior court and the Commission are affirmed.

BECKER and LAU, JJ., concur.

Review denied at 169 Wn.2d 1028 (2010).