[No. 86739-9.   En Banc.]
Argued November 13, 2012.   Decided February 21, 2013.

INTERNATIONAL UNION OF OPERATING ENGINEERS, AFL-CIO, LOCAL 286, *Petitioner*, v. THE PORT OF SEATTLE, *Respondent*.

*Dmitri L. Iglitzin* and *Sean M. Leonard* (of *Schwerin Campbell Barnard Iglitzin & Lavitt LLP*), for petitioner.

*Diana S. Shukis* and *Michael S. Brunet* (of *Garvey Schubert Barer*), for respondent.

*Martin S. Garfinkel* on behalf of Washington State Labor Council, amicus curiae.

*Jeffrey L. Needle, Jesse A. Wing, Sarah A. Dunne,* and *Nancy L. Talner* on behalf of Washington Employment Lawyers Association and American Civil Liberties Union of Washington Foundation, amici curiae.

¶1 OWENS, J. — This case concerns an arbitration award arising out of a collective bargaining agreement. Courts do not typically review such arbitration awards because extensive judicial review would "weaken the value of bargained for, binding arbitration and could damage the freedom of contract." *Kitsap County Deputy Sheriff's Guild v. Kitsap County*, 167 Wn.2d 428, 435, 219 P.3d 675 (2009). Courts will, however, vacate an arbitration award in the rare situation that it violates an explicit, well-defined, and dominant public policy, such as this state's public policy against racial harassment in the workplace.

¶2 The arbitration award in this case reinstated Port of Seattle (Port) employee Mark Cann with a 20-day unpaid suspension after he was terminated for hanging a noose in the workplace for nonracial reasons. The reviewing trial court found this punishment so lenient that it violated the public policy against racial harassment in the workplace and imposed a six-month unpaid suspension instead.

¶3 Although the noose has a hateful, racist, and violent history in this country and we condemn Cann's ignorant and unacceptable actions, our scope of review is extremely

limited. We review only the arbitrator's award and not the underlying conduct. In this case, the arbitrator found that Cann intended the noose as a joke toward an older white co-worker. The arbitrator determined that Cann's impression of a noose was "not racial" and that in this situation, Cann was "more clueless than racist." Clerk's Papers (CP) at 655, 657. The arbitrator also noted that the white employee targeted by the "joke," *id.* at 652, was not offended, and an African-American employee who observed the noose was angry but did not feel harassed. In light of these facts and Cann's 12 years at the Port with no performance problems, the arbitrator determined that a 20-day unpaid suspension was the appropriate discipline. Given that Cann's 20-working-day unpaid suspension amounts to a month without pay, and given that so many working families live month to month, we find that to be a substantial penalty. As we are bound by the arbitrator's findings of fact, we cannot find that a 20-day suspension was insufficient to deter such conduct in the future. Therefore, we reverse the trial court's decision to vacate the arbitrator's award. We also take this opportunity to clarify that a trial court that properly vacates an arbitration award does not have authority to impose its own remedy. Instead, trial courts facing such a situation should remand for further proceedings.

## ■ FACTS[1]

¶4 On December 12, 2007, Cann's supervisor asked him to put away a rope hanging from a ladder. Instead, as a joke toward a 70-year-old white co-worker Dick Calhoun, Cann tied the rope into a hangman's noose and said in a joking manner, " 'This is for Dick Calhoun, to put him out of his misery.' " *Id.* at 651. He then hung the noose over the shop floor.

---

[1] Courts do not review an arbitrator's factual determinations. *Clark County Pub. Util. Dist. No. 1 v. Int'l Bhd. of Elec. Workers, Local 125*, 150 Wn.2d 237, 245, 76 P.3d 248 (2003). Therefore, these facts are drawn directly from the arbitrator's award.

¶5 An African-American employee saw the noose and reported it. That employee did not find the display harassing or criminal but did describe his reaction as " 'angry.' " *Id.* at 650. Cann attempted an apology, but the arbitrator found that Cann's apology fell short of sincere. The target of the joke, Calhoun, stated that he was not offended or threatened.

¶6 The Port conducted an investigation and ultimately terminated Cann for violating the Port's antiharassment policy, known as "HR 22." The relevant parts of HR 22 state:

> "The Port of Seattle does not tolerate illegal harassment in the workplace. Illegal harassment refers to behavior that is not welcome, that is personally offensive, that debilitates morale, and that, therefore, interferes with work effectiveness. Illegal harassment includes but is not necessarily limited to unwelcome verbal or physical conduct that is derogatory of an employee's age, race, color, national origin/ancestry . . . Violations of this policy may result in disciplinary action up to and including termination.
>
> "II. DETAILS:
>
> "Examples of conduct prohibited by this policy include:
>
> "Displaying or circulating . . . objects that demean or show hostility to a person because of the person's age, race, color, national origin/ancestry . . . or any other category protected by law."

*Id.* at 645 (alterations in original). The Port had previously mandated antiharassment training for all employees, and Cann took the training. The Port circulated a " 'Zero-Tolerance' " policy regarding such behavior, codified as:

> "A 'zero tolerance' policy is a policy of having no tolerance for transgressions under the policy. Any alleged violation of this (anti-harassment) policy will generate an investigation and, if verified, will be considered "gross misconduct" and can subject an employee to immediate termination."

*Id.* at 645-46.

¶7 After Cann's termination, his union, the International Union of Operating Engineers, Local 286 (Union),

requested arbitration pursuant to its collective bargaining agreement with the Port. The issue before the arbitrator was: "Did the Employer have just cause for their termination of Mark Cann on February 11, 2008, and, if not, what shall the remedy be?"[2] *Id.* at 635.

■ ¶8 The arbitrator held a hearing and applied labor arbitration's " 'Seven Tests' " of just cause[3] to determine whether Cann's termination was for just cause. *Id.* at 644. The first six tests relate to whether the individual committed the violation of which he or she was accused, and the seventh test relates to whether the discipline was appropriate. For Cann, the arbitrator found that the first six tests were met:

1. The Port gave Cann forewarning of the possible or probable disciplinary consequences of his conduct.

2. The interests that the Port sought to protect through its antiharassment policy were legitimate and were reasonably related to the orderly, efficient, and safe operation of its business and the performance that it might properly expect of its employees.

3. The Port made an effort to discover whether the employees did in fact violate the antiharassment policy.

4. The Port's investigation was conducted fairly and objectively.

5. The Port's investigator obtained substantial evidence or proof that Cann was guilty of the violation of the antiharassment policy.

---

[2] The arbitrator also addressed whether there was just cause to discipline Terry Chapman, a subordinate of Cann's who assisted him with the noose. Chapman was given a verbal warning, and the arbitrator found just cause for that discipline. Chapman's discipline was not challenged by the Port.

[3] The seven tests for just cause were established in 1966 and, according to the arbitrator, are now "commonplace in labor arbitration." CP at 644. We have held "that the arbitrator is the final judge of both the facts and the law, and 'no review will lie for a mistake in either.' " *Clark County Pub. Util. Dist. No. 1,* 150 Wn.2d at 245 (internal quotation marks omitted) (quoting *Dep't of Soc. & Health Servs. v. State Pers. Bd.,* 61 Wn. App. 778, 785, 812 P.2d 500 (1991)). Therefore, we do not review the arbitrator's determination regarding which rules to apply in this situation.

6. The Port applied its antiharassment policy evenhandedly and without discrimination to all of its employees.

Because the first six tests were met, the arbitrator concluded that Cann had violated the Port's antiharassment policy and warranted discipline.

¶9 The arbitrator then proceeded to the seventh test: whether the degree of discipline administered by the Port was reasonably related to the seriousness of Cann's proven offense and Cann's record of service with the Port.

¶10 The arbitrator noted that "the noose, in our national history, literature, and consciousness, communicates hatred and death, frequently targeting African Americans, and its display is a destructive element in a workplace." *Id.* at 646. The arbitrator also stated "that a noose is an object of a nature such that its display would reasonably be expected to be demeaning or show hostility to people of a protected class" and that "[t]he employer has a legitimate interest in expecting that its employees would be so aware as to avoid its display." *Id.* However, the arbitrator found that "Cann had spent several years in the Navy and had frequently played with rope, often tying a noose to pass the time" and that "[h]is impression of a noose was not racial, but derived from 'Cowboys and Indians.'" *Id.* at 655. As a result, the arbitrator found "that, in this matter, [Cann] was more clueless than racist." *Id.* at 657. Taking into account Cann's 12 years of service with the Port with no history of performance problems, the arbitrator found that termination was excessive and without just cause. The arbitrator ordered that the Port reinstate Cann with back pay and reduce his discipline to a 20-day suspension.

¶11 The Port petitioned King County Superior Court for a writ of certiorari, and the court accepted review. The court granted the Port's motion to vacate the arbitrator's award, holding that the award violated the public policy against workplace harassment. The court then ordered its own remedy, which included (1) a six-month suspension; (2) a sincere letter of apology from Cann promising he will never

engage in similar conduct; (3) Cann's attendance at diversity and antiharassment training; and (4) if Cann were to violate the Port's antiharassment policy during the four years following his restatement, he would be immediately terminated without any further process, including any process outlined by the Union's collective bargaining agreement.

¶12 The Union appealed, and the Court of Appeals affirmed the trial court's decision to vacate the arbitration award but held that the trial court did not have authority to fashion its own remedy and thus remanded for further proceedings. *Port of Seattle v. Vivenzio*, 164 Wn. App. 307, 326, 264 P.3d 268 (2011). This court granted the Union's petition for review. *Int'l Union of Operating Eng'rs, Local 286 v. Port of Seattle*, 173 Wn.2d 1026, 273 P.3d 982 (2012).

## ISSUES PRESENTED

¶13 1. Does an arbitrator's decision to impose a 20-day suspension on an employee who hung a noose in the workplace violate the public policy against racial harassment and discrimination?

¶14 2. If a trial court vacates an arbitration decision, may it impose its own remedy?

## ANALYSIS

### A. *Standard of Review*

¶15 Courts will review an arbitration decision only in certain limited circumstances, such as when an arbitrator has exceeded his or her legal authority. *Clark County Pub. Util. Dist. No. 1 v. Int'l Bhd. of Elec. Workers, Local 125*, 150 Wn.2d 237, 245, 76 P.3d 248 (2003). To do otherwise would call into question the finality of arbitration decisions and undermine alternative dispute resolution. *Id.* at 246, 247. This court has noted that "[w]hen parties voluntarily sub-

mit to binding arbitration, they generally believe that they are trading their right to appeal an arbitration award for a relatively speedy and inexpensive resolution to their dispute." *Id.* at 247. Thus, a more extensive review of arbitration decisions "would weaken the value of bargained for, binding arbitration and could damage the freedom of contract." *Kitsap County Deputy Sheriff's Guild*, 167 Wn.2d at 435.

¶16 However, like any contract, an arbitration decision arising out of a collective bargaining agreement can be vacated if it violates public policy. *Id.* at 435-36. The court treats the arbitration decision as if it were part of the contract, and such a decision will be vacated if it violates an " 'explicit,' 'well defined,' and 'dominant' public policy, not simply 'general considerations of supposed public interests.' " *Id.* at 435 (internal quotation marks omitted) (quoting *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62, 121 S. Ct. 462, 148 L. Ed. 2d 354 (2000)).

### B. Whether the Arbitration Award Violates Public Policy

¶17 The laws against workplace discrimination and harassment set forth an explicit, well-defined, and dominant public policy. First, Washington's public policy against workplace discrimination could not be more explicit. The Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, states that "[t]he right to be free from discrimination because of race . . . is recognized as and declared to be a civil right." RCW 49.60.030(1). This right includes "[t]he right to obtain and hold employment without discrimination." RCW 49.60.030(1)(a). This court has held that WLAD contains a "clear mandate to eliminate all forms of discrimination" and that the "purpose of the law is 'to deter and to eradicate discrimination in Washington.' " *Brown v. Scott Paper Worldwide Co.*, 143 Wn.2d 349, 359-60, 20 P.3d 921 (2001) (quoting *Marquis v. City of Spokane*, 130 Wn.2d 97, 109, 922 P.2d 43 (1996)). WLAD explicitly prohibits discrimination in the workplace.

¶18 Second, the public policy against workplace discrimination is dominant. This court has repeatedly said that WLAD expresses a " 'public policy of the "highest priority." ' " *Antonius v. King County*, 153 Wn.2d 256, 267-68, 103 P.3d 729 (2004) (quoting *Xieng v. Peoples Nat'l Bank of Wash.*, 120 Wn.2d 512, 521, 844 P.2d 389 (1993) (quoting *Allison v. Hous. Auth.*, 118 Wn.2d 79, 86, 821 P.2d 34 (1991))); *accord Marquis*, 130 Wn.2d at 109. A public policy "of the highest priority" is necessarily dominant.

¶19 Finally, the public policy against workplace discrimination is well defined. Federal courts and the Court of Appeals have held that employers must remedy harassment in such a way that persuades potential harassers to refrain from unlawful conduct. *See Perry v. Costco Wholesale, Inc.*, 123 Wn. App. 783, 793-94, 98 P.3d 1264 (2004); *Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991). The Equal Employment Opportunity Commission (EEOC) states that "[f]ailing to provide a work environment free of racial harassment is a form of discrimination." U.S. EQUAL EMPLOYMENT OPPORTUNITY COMM'N, EEOC COMPLIANCE MANUAL § 15--VII(A) (Apr. 19, 2006), http://www.eeoc.gov/policy/docs/racecolor.html (last visited Feb. 14, 2013). Thus, antidiscrimination laws create an affirmative duty for employers to prevent racial harassment in the workplace by sufficiently disciplining those who engage in harassing behavior. While the laws do not, and cannot, set standards as to the specific amount of discipline that is required for specific acts or patterns of harassment, the affirmative duty to *sufficiently* discipline harassers is well defined. Therefore, the laws against workplace discrimination and harassment express an explicit, well-defined, and dominant public policy aimed at both ending current discrimination and preventing future discrimination.

¶20 The Union argues that the public policy expressed in WLAD is not explicit or well defined because specific penalties are not enumerated—essentially arguing that WLAD must describe specific penalties for specific acts of

discrimination in order to vacate an arbitration decision for violating its public policy. The idea of a statute attempting to list all possible discriminatory acts is fairly absurd in and of itself, but the idea of assigning specific disciplines without taking into account the surrounding circumstances is particularly inappropriate. Such a list could not reasonably be created, and thus requiring such a list would destroy the public policy exception.

■ ¶21 We now turn to whether this particular arbitration award violates the public policy against workplace harassment and discrimination. As described above, we will vacate an arbitration award that does not impose sufficient discipline to end current discrimination and prevent future discrimination. However, we must balance that requirement with the general principle that "[j]udgments about how a specific employee will perform after reinstatement if given a lesser sanction are nothing more than an exercise of the arbitrator's broad authority to determine appropriate punishments and remedies." *Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173*, 886 F.2d 1200, 1213 (9th Cir. 1989). We cannot substitute our judgment for that of the arbitrator. Thus, the punishment required to change a specific individual's behavior is left to the arbitrator, but when an arbitrator's punishment is so lenient that it will not deter future discrimination—including discrimination committed by others—it must be vacated.

■ ¶22 Historically, the noose has been used as a hateful expression of violence and hostility toward African-Americans—not just symbolically, but in actual, horrific acts of murder. We acknowledge this terrible and tragic history and condemn the racial violence and threats of violence symbolized by the noose in the strongest terms possible. In this case, Cann hung a noose, intending to joke with an older, white co-worker, and the arbitrator essentially found that Cann was unaware of the hateful history of the noose, noting that Cann's impressions of a noose were "not racial." CP at 655. As a result, the arbitrator found that while

Cann's actions violated the Port's antiharassment policy, his actions were "more clueless than racist." *Id.* at 657.

¶23 In determining the appropriate punishment, the arbitrator took into account the effect that the "prank," *id.*, had on its intended target—the white employee who indicated he was not offended—as well as the African-American employee who reported the noose and reportedly stated that he was angry but did not find the display harassing or criminal. The arbitrator also considered Cann's 12-year employment history at the Port with no performance problems and ultimately determined that a 20-day unpaid suspension was an appropriate punishment for him.

¶24 As described above, we are bound by the arbitrator's findings of fact. As a result, we must accept the arbitrator's findings regarding Cann's understanding of the symbolism of the noose, as well as the findings on the effect of the noose on the other employees in the workplace. When we take into account the specific circumstances of this case, we cannot say that a 20-day unpaid suspension would not provide sufficient discipline to cause this or other employees to understand the serious nature of a noose in the workplace and thus prevent a similar incident in the future.

¶25 We reiterate that we find Cann's actions to be ignorant and unacceptable and that our analysis in this case is limited to determining whether the arbitrator's award is so lenient that it violates the public policy against racial harassment. We do not determine whether a 20-day suspension is the appropriate punishment for Cann's actions or whether he violated antidiscrimination laws—either of which would be analyzed under a very different legal framework.

¶26 We choose not to speculate what level of discipline would have been insufficient to prevent a similar incident in the future. Further, a 20-day suspension might be wholly insufficient for a different set of facts and circumstances, but it would be inappropriate for us to explore such hypo-

thetical situations here. We must leave those questions to another day.

## C. Whether a Trial Court Can Fashion Its Own Remedy

■ ■ ¶27 After finding that the arbitrator's decision violated public policy, the trial court imposed its own relief, including a six-month suspension, a letter of apology, diversity and antiharassment training, and a four-year probation period during which any violation of the Port's antiharassment policy would result in immediate termination without the possibility of any grievance procedure. However, the case law is clear that trial courts cannot impose their own remedy after vacating an arbitration decision.

¶28 This court turns to federal case law for guidance in labor law cases. *Kitsap County Deputy Sheriff's Guild*, 167 Wn.2d at 435. The United States Supreme Court has explicitly held that a reviewing court that vacates an arbitration decision may not then make a decision on the merits:

> [A]s a rule the court must not foreclose further proceedings by settling the merits according to its own judgment of the appropriate result, since this step would improperly substitute a judicial determination for the arbitrator's decision that the parties bargained for in the collective-bargaining agreement. Instead, the court should simply vacate the award, thus leaving open the possibility of further proceedings if they are permitted under the terms of the agreement. The court also has the authority to remand for further proceedings when this step seems appropriate.

*United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 41 n.10, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987); *see also Major League Baseball Players Ass'n v. Garvey*, 532 U.S. 504, 510-11, 121 S. Ct. 1724, 149 L. Ed. 2d 740 (2001) (noting that the proper remedy upon vacating an arbitrator's award is remand and that the reviewing court does not have authority to resolve the dispute). We find no authority

that would allow a trial court to impose its own remedy for a vacated arbitration decision. Therefore, we take this opportunity to clarify that a trial court vacating an arbitration decision cannot impose its own remedy; instead it should remand to the arbitrator for further proceedings.

## CONCLUSION

¶29 WLAD establishes an explicit, well-defined, and dominant public policy against workplace harassment. While we find Cann's actions to be ignorant and unacceptable, we cannot find that the arbitrator's decision to reduce Cann's discipline for his "clueless" action to a 20-day suspension was so lenient as to violate the public policy against workplace harassment. We therefore reverse the Court of Appeals and hold that the arbitration decision does not violate public policy. We also clarify that a trial court vacating an arbitration decision may not impose its own remedy.

MADSEN, C.J.; C. JOHNSON, FAIRHURST, J.M. JOHNSON, STEPHENS, and WIGGINS, JJ.; and CHAMBERS and PENOYAR, JJ. PRO TEM., concur.