
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| CITY OF PROSSER, | ) | |
| | ) | No. 37889-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TEAMSTERS UNION LOCAL 839; | ) | UNPUBLISHED OPINION |
| KENNETH JAMES LATSCH, | ) | |
| | ) | |
| Appellants. | ) | |

SIDDOWAY, C.J. — After investigating allegations that Police Officer Shane

Hellyer sexually assaulted one female citizen and sexually harassed three others, the city

of Prosser (City) terminated his employment. Mr. Hellyer's union, Teamster's Union

Local 839 (Union), filed a grievance that proceeded to arbitration. In an award that

focused on one citizen's allegations of sexual assault, the arbitrator found that the

investigation by the City's Police Department (Department) was unfair and incomplete,

and the Department's conclusion that Mr. Hellyer committed the alleged sexual assault

was not supported by clear evidence. The arbitrator ordered that Mr. Hellyer be

reinstated as a police officer with full back pay and benefits.

The City applied to the Benton County Superior Court for a writ of certiorari,

asking the court to review and vacate the arbitration award on grounds that by finding

that Mr. Hellyer may have sexually harassed three other citizens and nonetheless ordering

him reinstated with back pay and benefits, the arbitrator violated public policy.

Following a remand to the arbitrator and a clarifying award, the superior court agreed

with the City and vacated the award, leading to this appeal by the Union.

The Union conflates the arbitrator's explanation for rejecting the sexual assault

allegation as a basis for discipline (a conclusion never challenged by the City) with the

arbitrator's originally unexplained rejection of three citizen complaints of sexual

harassment as a basis for discipline.  We agree with the superior court that the arbitrator's

award on remand—concluding that the interactions reported by the women were

neutralized and were only "coarse conversation" that could not be cause for discipline—

violates public policy.  Clerk's Papers (CP) at 389.  We affirm.

### FACTS AND PROCEDURAL BACKGROUND

We draw our description of relevant facts leading up to the parties' arbitration

from the arbitrator's arbitration award and award on remand.  In some cases, we provide

detail from exhibits to which the arbitration awards refer.

On August 11, 2017, during the course of an interview by Benton County sheriff's

deputies, Alexandra Hart told them that Prosser Police Officer Shane Hellyer touched her

inappropriately eight months earlier, during her detention after she had created a

disturbance at a local residence.  She explained that the prior December 19, after she was

handcuffed and placed in the back of his patrol car, Officer Hellyer transported her to the

2

Prosser Junior High School parking lot, where he touched her breasts and her vaginal area without her consent. She claimed that he then drove her to her residence, where, after she stepped out of the patrol vehicle, still handcuffed, he pressed up against her and made her touch his penis through his pants. She told the deputies that on another occasion, Officer Hellyer had showed her lingerie, saying he would buy it for her if she wanted. She told the deputies Officer Hellyer had also suggested that they go to a nearby soccer field, which she assumed was because he wanted to have sex with her.

Ms. Hart's allegations were investigated by the sheriff's office. On August 30, 2017, after learning of the allegation, Prosser Police Chief Dave Giles placed Officer Hellyer on administrative leave. The City also decided it was necessary to conduct its own investigation.

Officer Hellyer had previously received no formal discipline, but he had been verbally reprimanded on one occasion. An exhibit later submitted in the arbitration was the record of an April 2008 investigation of a female citizen's complaint of unwanted advances from Officer Hellyer. Prosser Police Sergeant (Sgt.) Ed Blackburn had investigated the 2008 complaint, and his investigative report stated that while the complainant told him she did not want to file a formal complaint at that time, she did want Officer Hellyer to leave her alone, failing which she would file a formal complaint. Sgt. Blackburn had recommended that Officer Hellyer be given a chance to defend

3

himself, and if no exculpatory information was forthcoming, he be informally disciplined and warned to have no further interaction with the complainant.

Sgt. Blackburn was assigned to conduct the investigation into Ms. Hart's allegations. Ms. Hart had been taken into custody by Officer Hellyer following a disturbance the prior December 19, and Sgt. Blackburn interviewed two other officers who responded to the incident, Prosser Police Officer Raul Sabalza and Benton County Sheriff's Deputy Mathew Clarke. He also interviewed Ms. Hart, her parents, and other Prosser police officers, only one of whom, Matt Shanafelt, had any information of interest. Officer Shanafelt remembered an incident where Officer Hellyer told him where to observe a woman in a local apartment while she was disrobing. He also recounted a complaint he received about Officer Hellyer from Teresa Gannon, a local business owner.

Teresa[1] operated a horticulture nursery in Prosser. She often worked late, and Officer Hellyer would come by the business to check on her well-being. She told Sgt. Blackburn that Officer Hellyer would tell her about his sex life with his wife, and that he told her about purchasing a sexual lubricant. He later sent her a picture of the lubricant. Teresa also told the sergeant that Mr. Hellyer would show her photographs of women in risqué clothing, and that his conversations with her would often turn to sexual matters.

---

[1] We refer to Teresa Gannon by her first name for clarity, because Brandace Gannon (who we refer to as Brandi) was also interviewed.

Teresa said Officer Hellyer made her so uncomfortable that her husband would often come by the nursery to check on her well-being.

Brandi Gannon, Teresa's daughter-in-law,[2] told Sgt. Blackburn that she was present when Officer Hellyer visited her mother-in-law's store.[3] She specifically complained that Officer Hellyer would often say that she and her mother wore very little, and in one instance he made a comment about the store being cold and that the women should wear more to cover themselves.[4] Brandi also told investigators that Officer Hellyer would tell her about his sex life with his wife.

Kelli Schutt, who Sgt. Blackburn learned also had complaints about Officer Hellyer, told the sergeant that Officer Hellyer would come to her place of employment, a local winery, and that he often used sexual innuendo in his conversations with her. Ms. Schutt said that Officer Hellyer made her feel uncomfortable, and that he would sometimes stop by her residence in his patrol vehicle.

---

[2] The arbitrator describes Brandi as Teresa's daughter, but Sgt. Blackburn's report and other parts of the record consistently identify her as Teresa's daughter-in-law.

[3] This and other details about the harassment complainants' allegations did not appear in the arbitrator's initial award, but do appear in his award on remand.

[4] The arbitrator does not explain why Brandi would view this as sexual harassment, but the written evidence to which the arbitrator refers states that Brandi told Sgt. Blackburn, "Although it was not said directly,[ I] understood . . . [this] to mean that her nipples on her breasts were showing through her shirt." CP at 35.

On December 20, 2017, while Sgt. Blackburn's investigation was ongoing, the

Benton County prosecutor provided the county sheriff's office with a written declination

to prosecute Officer Hellyer for the alleged assault of Ms. Hart. Its letter stated,

> The State does believe that a preponderance of the evidence shows that
> Officer Hellyer had inappropriate contact with Alexandra Hart (AH), by
> [sic] given AH's mental state on the night of the alleged incident and how
> long it took to disclose the allegation, the State does not believe this matter
> can be proved beyond a reasonable doubt.

CP at 11. Sgt. Blackburn thereafter conducted several more interviews and conducted a

second interview of Ms. Hart on January 8, 2018.

Officer Hellyer was called in for a meeting with Chief Giles, Sgt. Blackburn and

others the next day, to respond to questions about taking Ms. Hart into custody in

December 2016 and about his interactions with Ms. Gannon. He gave conflicting

answers to the questions asked, and often responded by not recalling specifics about the

events under investigation. He was told that there was no record of his interaction with

Ms. Hart in police files. After the meeting, however, Officer Hellyer's union

representative found a log that contained details about the disputed events that helped

explain Officer Hellyer's actions on December 19. Officer Hellyer provided the

additional information to Chief Giles.

The Union would later present evidence that in contacts with Ms. Hart beginning

in March 2016, Officer Hellyer became aware that Ms. Hart was becoming involved with

the local drug culture. According to Officer Hellyer, his interest in Ms. Hart was

nonsexual and intended to help her get on the right track. After Ms. Hart caused the disturbance on December 19 and was taken into custody, it was agreed by responding officers that Officer Hellyer would take her to the police station. While he ended up taking her home instead, Officer Hellyer explained that was because as he and Ms. Hart sat outside the station, speaking and awaiting the arrival of Officer Sabalza, he heard radio traffic about a possible stolen vehicle and believed he should respond. He claims that after driving Ms. Hart home, he removed her handcuffs according to standard procedure, which involved placing her against his patrol car and placing his knee against the back of her leg. He testified that his conversation with Ms. Hart in his patrol car on December 19, and conversations with her in his patrol car two days earlier and thereafter were all about whether she would agree to work as part of the Benton County Anti-Drug Task Force as an informant. He testified that he set up a meeting for her with task force members, but she failed to appear and he had no further contact with her.

Sgt. Blackburn's 27-page report on his internal investigation was directed to Chief Giles on January 13, 2018. It itemized possible violations by Officer Hellyer of the Prosser Police Department's personnel policy and procedures manual, described the investigation by the Benton County Sheriff's Office and Sgt. Blackburn's own interviews of well over a dozen individuals, and concluded with his findings.

Sgt. Blackburn found more violations of Department policies and procedures in Officer Hellyer's interaction with Ms. Hart than with any other single individual. But he

7

also found violations of the manual in Officer Hellyer's dealings with Teresa and Brandi Gannon and Kelli Schutt, who we sometimes refer to collectively hereafter as the "complaining businesswomen."

On March 29, 2018, Mr. Hellyer was discharged from employment by the Department. The Union filed a grievance concerning the termination, and the matter proceeded through the contractual grievance procedure to a two-day arbitration hearing before a mutually-agreed arbitrator.

Following the arbitration hearing, the parties were permitted to file posthearing briefs, and the arbitrator issued a 17-page written award. His award framed the issues presented as, "Did the City of Prosser have cause to terminate Officer Shane Hellyer from employment with the Prosser Police Department," and "If not, what is the appropriate remedy?" CP at 5. He analyzed the issues by applying seven elements of just cause identified for employee discipline in 1965 in *Enterprise Wire Co.*, 46 Lab. Arb. Rep. (BNA) 359 (1966) (Daugherty Arb.). He observed that the City, as the employer, bore the burden of proof. Analyzing each element separately, he was satisfied that the City proved the first three of the seven elements.[5]

---

[5] He "[had] no doubt that Mr. Hellyer was adequately warned about the kind of actions involved in this matter," stated that the City "presented credible evidence that it had a number of personnel rules and policies that should have applied in this case," and "[was] satisfied that an investigation was conducted in this matter." CP at 14-15.

The arbitrator's award focused on the allegations of Ms. Hart. He found just cause for termination lacking because "Ms. Hart did not have specific recollections about several critical aspects of her interactions," Sgt. Blackburn "often used 'leading questions' to elicit information from Ms. Hart," "Ms. Hart's credibility as a witness was questionable, at best," and after Mr. Hellyer "attempted to present information that would have exonerated him for the most serious allegations concerning his interactions with Ms. Hart, . . . the Employer did not follow up on any of his evidence." CP at 15-16. The arbitrator also expressed concern that Sgt. Blackburn relied on "second-hand sources," gathered "anecdotal accounts rather than first person narratives" and reported "a great deal of innuendo." CP at 16. These concerns also must have related to the investigation of Ms. Hart's allegations, because Sgt. Blackburn's information about the complaining businesswomens' interactions with Mr. Hellyer were from first-person interviews.

The initial award assumes the conduct alleged by the complaining businesswomen occurred, stating "[t]he other matters covered in the investigation could have led to other disciplinary action" and if Ms. Hart's allegations did not support discipline, "I cannot find that other events discovered during the investigation should rise to that level." CP at 16-18.

The arbitrator's only other discussion of the allegations of the complaining businesswomen in his initial award were his statements that "the Union has presented enough evidence to *neutralize* the allegations," there appeared to be *inconsistencies* in

9

witness accounts, and the Union "introduced credible testimony and evidence that *minimized any violation* that Mr. Hellyer may have committed." CP at 17 (emphasis added).

In seeking a writ of certiorari and review of the award, the City pointed out that the arbitrator's award pertained almost exclusively to Ms. Hart's allegation of custodial sexual assault, including only two sentences addressing other allegations of misconduct including the allegation that while on patrol, Mr. Hellyer sexually harassed women who worked in the Prosser community. The City relied on *Stroehmann Bakeries, Inc. v. Local 776, Int'l Brotherhood of Teamsters*, in which the federal Third Circuit Court of Appeals held that an arbitration award that fully reinstated an employee accused of sexual harassment without determining that the harassment did not occur violated public policy. 969 F.2d 1436, 1442 (3d Cir. 1992).

Rather than vacate the award, the superior court remanded it to the arbitrator with directions to clarify whether he found that Mr. Hellyer sexually harassed Teresa and Brandi Gannon and Ms. Schutt, as proscribed by Washington law. If the arbitrator did find sexual harassment, the superior court directed him to address why there was not just cause for discipline.

In his award on remand, the arbitrator accepted the Department's findings of the conduct that the complaining businesswomen viewed as sexual harassment. He clarified what he perceived as the "neutralizing" explanations and concluded that "the most that

can be found in this case would amount to the type of coarse conversation that may take place in a workplace." CP at 389.

When the matter returned to the superior court on the City's motion to vacate the award, the superior court granted the motion, concluding that the award violated the clear public policy of the Washington Law Against Discrimination, chapter 49.60 RCW (WLAD), to ensure the civil right "'. . .to be free from discrimination.'" CP at 422. The Union appeals.

ANALYSIS

*Standard of review*

Courts will review arbitration decisions in only limited circumstances. *Int'l Union of Operating Eng'rs, Local 286 v. Port of Seattle*, 176 Wn.2d 712, 720, 295 P.3d 736 (2013). "When parties voluntarily submit to binding arbitration, they generally believe that they are trading their right to appeal an arbitration award for a relatively speedy and inexpensive resolution to their dispute." *Clark County Pub. Util. Dist. No. 1 v. Int'l Brotherhood of Elec. Workers*, 150 Wn.2d 237, 247, 76 P.3d 248 (2003). Reviewing an arbitration decision for mistakes of law or fact would call into question the finality of arbitration decisions and undermine alternative dispute resolution. *Kitsap County Deputy Sheriff's Guild v. Kitsap County*, 167 Wn.2d 428, 434-35, 219 P.3d 675 (2009) (citing *Clark County*, 150 Wn.2d at 246).

In *Kitsap County*, our Supreme Court adopted the approach of federal courts and many other state courts that treat a labor arbitration decision as if it were part of the parties' collective bargaining agreement, which, like any contract provision, can be vacated if it violates public policy. *Id.* at 435-36.[6] The public policy exception to enforcing arbitral awards is limited to decisions that violate an "'explicit,' 'well defined,' and 'dominant' public policy, not simply 'general considerations of supposed public interests.'" *Id.* at 435 (internal quotation marks omitted) (quoting *E. Associated Coal Corp. v. United Mine Workers, Dist. 17*, 531 U.S. 57, 62-63, 121 S. Ct. 462, 148 L. Ed. 2d 354 (2000)). Whether a public policy is explicit, well defined and dominant "must be 'ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" *E. Associated*, 531 U.S. at 62 (internal quotation marks omitted) (quoting *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 766, 103 S. Ct. 2177, 76 L. Ed. 2d 298 (1983)).

In *Eastern Associated*, the United States Supreme Court held that the public policy exception applies when the arbitration award violates explicit, well defined and dominant *positive law*, but "in principle" was not limited to such instances, although the exception

---

[6] The court observed that "historically, we have turned to federal case law for guidance in labor law cases," *Kitsap County*, 167 Wn.2d at 435; *see accord Port of Seattle*, 176 Wn.2d at 725 ("This court turns to federal case law for guidance in labor law cases.").

must remain narrow. *Id.* at 63. Two concurring justices would have held that the

exception applies *only* when the arbitration award violates positive law. *Id.* at 63; 67-68

(Scalia, J., concurring).

Importantly, as explained by the United States Supreme Court, "the question to be

answered is not whether [the employee's conduct] itself violates public policy, but

whether the agreement to reinstate him does so." *Id.* at 62-63. The question is one of

law, which we review de novo. *Kitsap County*, 167 Wn.2d at 434. It has two facets:

whether the award implicates public policy that is explicit, well defined and dominant,

and whether the award violates that policy. *Port of Seattle*, 176 Wn.2d at 721-23; *see*

*also City of Seattle v. Seattle Police Officers' Guild*, 17 Wn. App. 2d 21, 38-60, 484 P.3d

485 (capitalization omitted), *review denied*, 198 Wn.2d 1004 (2021) (separately

addressing the "existence of a relevant public policy" and "whether the [award] violates

public policy").

*The arbitrator's awards implicate explicit, well defined and dominant public policies*

The WLAD declares "that practices of discrimination against any of its inhabitants

because of . . . sex . . . [is] a matter of state concern, that such discrimination threatens not

only the rights and proper privileges of its inhabitants but menaces the institutions and

foundation of a free democratic state." RCW 49.60.010. The WLAD recognizes and

declares that "[t]he right to be free from discrimination because of . . . sex . . . is . . . a

13

civil right," which includes the right to the "full enjoyment" of any place of public accommodation. *Floeting v. Grp. Health Coop.*, 192 Wn.2d 848, 853, 863, 434 P.3d 39 (2019) (some alterations in original) (quoting RCW 49.60.030(1)(b)).

"Sexual harassment is a form of sex discrimination, which we analyze like other forms of discrimination in places of public accommodation." *Id.* at 853. The WLAD "makes it unlawful for '*any* person or the person's agent or employee to commit an act' of, among other things, discrimination in a place of public accommodation." *Id.* at 856 (emphasis added) (quoting RCW 49.60.215). The WLAD's provisions "shall be construed liberally for the accomplishment of [its] purposes." RCW 49.60.020. There is no statutorily required pervasiveness or severity requirement for discriminatory conduct in a public accommodation context. *Floeting*, 192 Wn.2d at 858. A single discriminatory act in a place of public accommodation may violate the WLAD. *Id.* (citing cases).

A city employee who abuses his authority to sexually harass a private citizen also violates the equal protection clause of the Fourteenth Amendment to the United States Constitution. *E.g.*, *Johnson v. Martin*, 195 F.3d 1208, 1218 (10th Cir. 1999) (holding that the relevant law was "clearly established" in the post-October 1994 time frame for purposes of defendant's claim of qualified immunity); *cf. Sampson v. County of Los Angeles*, 974 F.3d 1012, 1023-24 (9th Cir. 2020) (plaintiff "plainly alleged a constitutional violation" by a male social worker assigned to her case who subjected her

to sexualized comments and unwanted advances). Moreover, a municipality that fails to take remedial action upon learning of repeated incidents of misconduct committed by a police officer can be deemed to have been deliberately indifferent to the misconduct and therefore liable under 42 U.S.C. § 1983. *City of Brooklyn Ctr. v. L. Enf't Lab. Servs., Inc.*, 635 N.W.2d 236, 242 (Minn. Ct. App. 2001); *Harris v. City of Pagedale*, 821 F.2d 499, 506 (8th Cir. 1987) (affirming jury verdict against municipality where there was sufficient evidence of its officials' failure to take remedial action despite notice of police officer's offensive acts). The equal protection clause of the Fourteenth Amendment and article I, section 12 of the Washington Constitution are substantially identical and subject to the same analysis. *State v. Osman*, 157 Wn.2d 474, 483 n.11, 139 P.3d 334 (2006) (citing *State v. Shawn P.*, 122 Wn.2d 553, 559-60, 859 P.2d 1220 (1993)).[7]

These laws and constitutional provisions evince explicit, well defined and dominant public policies aimed at ending current discrimination and preventing future discrimination in places of public accommodation and by officials acting under color of state law.

---

[7] Article I, section 12 states: "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations."

*The arbitration awards violate the public policies*

The question that remains is whether the arbitrator's awards violated these policies.

The City has never contended that for the arbitrator to reject Sgt. Blackburn's findings relating to Ms. Hart was outside his authority. What triggered the City's request for judicial review was the arbitrator's failure to address the conduct toward the complaining businesswomen that was a basis for Mr. Hellyer's discipline. As the City emphasized in its briefing to the arbitrator, and as the arbitrator acknowledged in his award, the Prosser Police Department operates through a small work force of sergeants and police officers. Given its small size, it is typical to have only two officers on duty at any time. A woman depending on police protection in Prosser would necessarily have to regularly rely on Mr. Hellyer.

The arbitrator took the position in the initial award that the sexual harassment conduct alleged by women other than Ms. Hart should not have been part of the Department's investigation. His award states, "The investigation . . . expanded to events that took place over five years prior to the December 19, 2016 incident. At this point, it appears that the Employer was adding events to the initial investigation to make sure that something could be attributed to Mr. Hellyer's bad actions." CP at 18. In performing his just cause analysis, the arbitrator treated the Department's investigation of Mr. Hellyer's conduct toward the complaining businesswomen as weighing *against the City*,

16

characterizing the investigation of their complaints as "not an evenhanded application of work rules." CP at 18.

The employee whose reinstatement was vacated in *Stroehmann Bakeries*, on which the City relied in moving to vacate the arbitration award, was Samuel Leonard, a delivery driver for the bakery company, who was discharged for "immoral conduct" after a customer accused him of sexual harassment. 969 F.2d at 1437-38. Leonard challenged his discharge, and the arbitrator, having concluded that Stroehmann failed to give Leonard a full opportunity to refute the charges or explain his conduct, ordered him reinstated without deciding whether the charge of sexual harassment was true. *Id.* at 1437. A federal district court vacated the arbitrator's award for violating public policy and remanded for a de novo hearing before a different arbitrator. *Id.* The Third Circuit Court affirmed.

The Union argues that *Stroehmann* is distinguishable, characterizing the arbitrator in that case as having "*refused to consider* evidence and testimony concerning sexual harassment." Br. of Appellant at 24 (emphasis added). According to the Third Circuit, however, the arbitrator did hear evidence and testimony that he considered to some extent. The arbitrator referred to the female customer's weight and the fact that she had no social life, and characterized her as "'unattractive and frustrated.'" 969 F.2d at 1446. The arbitrator allowed Leonard's attorney, over objection, to ask Stroehmann's representative, "Would you think an average man would make a pass at a woman like

17

that?" *Id.* The arbitrator commented on Leonard's testimony that he had told the female customer "he wished his wife's breasts were hard like an orange." *Id.* at 1440. The arbitrator also stated that if he had to make a decision on the merits, he would find in Leonard's favor. The arbitrator heard evidence and testimony; he simply "studiously avoided the charges against Leonard" and "refused to find whether the alleged sexual harassment occurred." *Id.* at 1440, 1443.

In this case, the arbitrator likewise heard evidence but initially, he studiously avoided making *clear* findings that the conduct alleged by the complaining businesswomen occurred. Required by the superior court to decide that issue, he announced that he would accept the Department's findings and would "not substitut[e his] judgment for the Employer's initial investigation" on the matter of the conduct alleged by the complaining businesswomen. CP at 387. He proceeded to identify the "facts presented" that the City concluded warranted discipline. *Id.* This case is different from *Stroehmann*, but only because our arbitrator found the conduct occurred, but concluded it did not amount to sexual harassment.

The arbitrator provided two reasons for his conclusion that sexual harassment was not shown. First, his initial award states that the City's evidence of the alleged harassment was "neutralize[d]." CP at 17. He did not initially identify how he viewed it as neutralized, but he sets forth his reasons in the award on remand.

18

Teresa's allegations were, again, that Officer Hellyer would tell her about his sex life with his wife and about purchasing a sexual lubricant, showing her a picture of the lubricant. He showed her photographs of women wearing risqué clothing and his conversations with her would often turn to sexual matters. She said that Officer Hellyer made her so uncomfortable that her husband would often come by the nursery to check on her. Mr. Hellyer admitted that he told Teresa about sexual lubricants and showed her pictures of women in lingerie.

The arbitrator found this to be neutralized by "different information" provided by Mr. Hellyer: that the lingerie he showed Teresa was concealed carry holsters. CP at 388. But Teresa had told investigators the same thing; she told them that Officer Hellyer showed her pictures of women in intimate apparel as suggestions after she obtained her concealed weapon permit. She still viewed the pictures as "sexy concealed carry clothing that were inappropriate." CP at 122.

The arbitrator also found the allegations to be neutralized because of two reasons having to do with Teresa's husband: Officer Hellyer showed the lingerie to him as well, and Teresa's husband had expressed his thanks that Officer Hellyer would check on Teresa's place of business when on patrol.

Brandi's complaints were, again, that Officer Hellyer would often say that she and her mother-in-law wore very little and, in one instance, made a comment about the store being cold and the women should wear more to cover themselves. Brandi, too, said that

19

Officer Hellyer would tell her about his sex life with his wife. The arbitrator found this to be neutralized by Mr. Hellyer's belief that he had a "good relationship" with Brandi, who "had never shown any discomfort with him." CP at 388.

Ms. Schutt's complaints were, again, that Officer Hellyer would come by her place of business and often used sexual innuendo in his conversations with her. She said Officer Hellyer made her feel uncomfortable, and would sometimes stop by her residence in his patrol vehicle. The arbitrator found this to be neutralized by the fact that Ms. Schutt no longer lived in Prosser and said her memory of the events was not good. What Ms. Schutt said, as recounted in the Department's internal investigation report, was that "her memory of what exactly was said has been forgotten," but "pretty much anything he said was inappropriate as everything seemed to have a sexual innuendo." CP at 120.

The arbitrator's second reason for concluding that none of Mr. Hellyer's conduct warranted discipline was that "the most that can be found in this case would amount to the type of coarse conversation that can take place in a workplace." CP at 389.

There are three lines of reasoning in the arbitrator's awards that we conclude violate the express, well defined, dominant public policies to end and prevent discrimination in places of public accommodation by officials acting under color of state law.

The first is the position taken by the award that since the investigation began as one into Ms. Hart's allegations, for the Department to follow up when it learned that

other women in the community had complaints was unfair to Mr. Hellyer, and not an

evenhanded application of work rules. One of the well-defined public policies found by

*Stroehmann* was a "public policy favoring voluntary employer prevention and application

of sanctions against sexual harassment in the workplace," a public policy that it applied

in the context of harassment of a customer, not a coworker. 969 F.2d at 1442. As earlier

observed, for a municipality to fail to take remedial action upon learning of a police

officer's misconduct can subject it to liability in a civil rights suit based on its deliberate

indifference. The Department would have been remiss had it ignored information that

Teresa, Brandi, and Ms. Schutt complained of sexual harassment by Officer Hellyer.

The second is the position taken by the award that what would otherwise be a

police officer's sexual harassment of a female citizen can be "neutralized" by the

following evidence: if pictures of women in intimate attire are shown not only to her, but

to her husband; if her husband thanks a police officer for checking on his wife's business;

if she tries to maintain a cordial relationship with the police officers on her town's small

police force; or if she has moved out of town.

The third is that for a police officer to repeatedly talk to female citizens in their

workplace about his sex life, his and his wife's sexual aids, his perception that the citizen

does not wear enough clothing, and to engage in sexual innuendo, is the kind of "coarse

conversation" that she should expect in her workplace. This case does not involve

harassment by a coworker, and as previously observed, the Washington Supreme Court

21

has held that a claim by a plaintiff who is served rather than employed by the defendant "is more of a consumer claim than a claim between an employee and employer, and [such a] claim is not limited by the employment discrimination statute." *Floeting*, 192 Wn.2d at 855.

The Union argues that because the arbitrator is the final judge of the facts and the law and no review will lie for a mistake in either, the superior court exceeded its limited scope of review and we will exceed ours if we independently determine that Mr. Hellyer's conduct violated anti-discrimination laws. We are not determining whether Mr. Hellyer's conduct violated anti-discrimination laws, however. Our issue is whether the legal reasoning the arbitrator applies in concluding that Mr. Hellyer's conduct could not support discipline violates the express, well defined and dominant policies evinced by the WLAD and the equal protection guarantees of the federal and state constitutions. As the United States Supreme Court held in *Eastern Associated*, that is a legal issue—a construction of positive law—that we *necessarily* review in deciding whether the public policy exception to enforcing arbitral awards applies.

We conclude that as construed by the arbitrator and reflected in his awards, the collective bargaining agreement and the awards violate express, well defined and

dominant policies in these respects. The superior court's order vacating the arbitration awards is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Lawrence-Berrey, J.

_____
Pennell, J.